BETH A. HUBER (SBN 1120263)
HUBER LAW LLC
N1131 County Road L
Watertown, WI 53098
Telephone:    (415) 497 9173
Facsimile:    (920) 542-6090
Email:  bhuber@huberlawfirm.net

Attorneys for Plaintiffs
PETER MARKGREN and
DARYL STROHSCHEIN

## UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| PETER MARKGREN and DARYL STROHSCHEIN<br><br>Plaintiffs,<br><br>vs.<br><br>SAPUTO CHEESE USA INC.<br><br>Defendant. | CASE NO. 3:21-cv-429<br><br>**COMPLAINT FOR DISCRIMINATION BASED ON AGE, HARASSMENT BASED ON AGE, REVERSE GENDER DISCRIMINATION, FAILURE TO REASONABLY ACCOMMODATE A DISABILITY AND PARTICIPATE IN THE INTER-ACTIVE PROCESS, DISABILITY DISCRIMINATION, RETALIATION IN VIOLATION OF FMLA, ADA AND ADEA, NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS, NEGLIGENT HIRING AND RETENTION, INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS, WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY, and JURY DEMAND**<br><br>**DEMAND FOR JURY TRIAL**<br><br>**(Title VII 42 U.S.C. §§ 2000e-2000e-17; Age Discrimination in Employment Act, 29 U.S.C. §§ 621 *et seq.*; Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.* ("ADA"); and Family and Medical Leave Act 29 U.S.C. §2601 *et seq.* ("FMLA"))** |

**JURISDICTION**

1.     The jurisdiction of this Court is based upon the existence of a federal question and arises under Title VII, 42 U.S.C. §2000e et seq. ("Title VII"), The Age Discrimination in Employment Act 29 U.S.C. §§ 621-634 ("ADEA"), the Family and Medical Leave Act 29 U.S.C. §2601 *et seq.* ("FMLA") and the Americans with Disabilities Act at 42 U.S.C. §12101 *et seq.* ("ADA").  As such, jurisdiction is conferred on this Court and Plaintiff is provided with the powers, remedies and procedures set forth in Title VII, § 2000e-5(f)(3), the ADEA 29 U.S.C. §626(b), the FMLA and the ADA. Supplemental jurisdiction over the tort claims exists pursuant to 28 U.S.C. § 1367(a).

**INTRADISTRICT ASSIGNMENT AND EXHAUSTION OF ADMINISTRATIVE REMEDIES**

2.     Venue is proper in this District pursuant to Title VII, 42 U.S.C. § 2000e-5(f)(3), the ADA, the ADEA and FMLA because the unlawful acts and practices alleged herein occurred in the Town of Almena, County of Barron, in Wisconsin, which are situated in this judicial district.

3.     At all material times, Plaintiff Peter Markgren ("MARKGREN"), was a resident of the State of Wisconsin, County of Barron.  Plaintiff Daryl Strohschein ('STROHSCHEIN") was also a resident of the State of Wisconsin, County of Barron.  The employment relationship upon which each of them sues herein was made in and to be performed in the Town of Almena, County of Barron, State of Wisconsin.   At all material times, MARKGREN and STROHSCHEIN worked for Defendant SAPUTO CHEESE USA INC. whose parent corporation is SAPUTO INC. ("SAPUTO" or "DEFENDANT") in Almena, WI.  The address where MARKGREN and STROHSCHEIN last worked for Defendant SAPUTO was 1052 6th St., Almena, WI 54805. MARKGREN and STROHSCHEIN are informed and believe, and on that basis alleges, that at all times the individuals referred to in this Complaint were and are owners, directors, officers, managers, and/or operators of the business known as SAPUTO.

4.     MARKGREN and STROHSCHEIN are informed and believe and thereon allege that SAPUTO is, and at all times herein mentioned, was, a corporation which was licensed to,

and was doing, business in Barron County, Wisconsin.  Defendant is an entity subject to suit under the Title VII 42 U.S.C. § 2000e-2000e-17, the Age Discrimination in Employment Act, 29 U.S.C. §§ 621-635, the Americans with Disabilities Act 42 U.S.C. § 12101 *et seq*. and the Family and Medical Leave Act 42 U.S.C. §12101 *et seq* as it is doing business in the State of Wisconsin.

5.     SAPUTO entered into an employment relationship with MARKGREN beginning in approximately May 1987 when MARKGREN was hired by Twin Town Cheese Factory which was later acquired by SAPUTO.   SAPUTO entered into an employment relationship with STROHSCHEIN who was hired by Twin Town Cheese Factory, later SAPUTO, in April 1984. He was promoted to a supervisor position in 2008. The injuries on which this action is based arise out of the aforementioned employment relationships.

6.     In April 2020, MARKGREN and STROHSCHEIN each filed complaints of discrimination and harassment based on their age and gender with the Wisconsin Department of Workforce Development, Equal Rights Division against SAPUTO.  MARKGREN also filed complaints of discrimination based on his disabilities and SAPUTO'S failure to reasonably accommodate those disabilities.  He also reported that he was retaliated against for having complained about harassment by younger employees and for taking needed family and medical leave time in violation of the Federal Family and Medical Leave Act.  These ERD administrative complaints resulted in companion complaints being filed with the Federal Equal Employment Opportunity Commission ("EEOC").  The Wisconsin Fair Employment Act ("WFEA") closed their investigations into MARKGREN'S and STROHSCHEIN'S administrative complaints in January-February 2021.

7.     The EEOC issued MARKGREN and STROHSCHEIN each a right-to-sue notice on April 7, 2021 which was received on by MARKGREN and STROHSCHEIN or about April 12, 2021.  The notice gave each 90 days in which to bring a federal action.

8.     By filing the above administrative complaints, MARKGREN and STROHSCHEIN have exhausted their administrative remedies and conferred the jurisdiction of this court.
/ / /

## STATEMENT OF FACTS

9.      MARKGREN began his employment with Twin Town Cheese Factory, later SAPUTO, in May 1987.  He began packing mozzarella cheese on the line then moved up to an operator position.  During the last several years MARKGREN worked as a Rotary Press Operator on the upper make room for blue cheese and then the lower make room for blue cheese. MARKGREN went above and beyond his job as operator by (i) often filling in on other shifts when another operator called out; (ii) coming in when called during the middle of the night to get the lower cheese filler running when maintenance couldn't get it working; and (iii) creating new forms for making feta cheese including by drilling holes into the new forms, scraping them then sanitizing them so the cheese would form correctly.  He even volunteered, without pay, to refinish cabinet doors and drawers from the break room prior to representatives from corporate arriving so the break room would look nice.  For approximately twenty years he trained new hires on how to run his and other machines in the plant.  His birthday is April 17, 1964.

10.     In 2012, MARKGREN suffered a heart attack and went out on a medical leave of absence. In May 2012 he underwent heart surgery for angioplasty (repair of arteries in his heart) due to his severe coronary artery disease.  Two stents were placed in his heart.  He returned to work in approximately June 2012.  In 2013, MARKGREN had another stent placed in his left anterior descending artery.  In July 2013, he was transported via EMS from SAPUTO to the hospital because he fainted at work due to an extremely high working temperature of over 100 degrees Fahrenheit and he'd been experiencing intermittent chest pain.  He was diagnosed with coronary artery disease, congested heart failure, hypertension and severe depression.  He went out on short term disability/family leave. In August 2013, his physician was concerned with MARKGREN exacerbating his orthostatic hypotension by working in a very hot environment and gave him a work restriction of working indoors at less than 100 degrees Fahrenheit.  He was also subsequently diagnosed with high blood pressure.  From then forward, MARKGREN continued to have a serious heart condition.  This condition was exacerbated during the summers because the temperatures inside the SAPUTO plant often exceeded 100 degrees Fahrenheit.

11.     In 2014, MARKGREN suffered a back strain.  The doctor also noted he had problems with a disc and diagnosed him with sciatica.  The extreme pain from the sciatica continued through-out his employment and at times, interfered with his ability to repetitively bend at his job.  In December 2016, MARKGREN went on family leave because he had bariatric surgery and returned in early 2017.  He suffered a worker's compensation injury on or about June 2, 2017.  He went to the emergency room but did not take any time off.

12.     In 2017, when the new air-conditioned plant began operating, MARKGREN asked to transfer to that plant because of his heart condition and because working in an air-conditioned plant would comply with his doctor's work restrictions/requested accommodations. SAPUTO, specifically Robin Sorey ("Sorey") in Human Resources, told him that if he transferred his pay would be reduced by almost $2.00/hour and denied his request. MARKGREN was never transferred to the newly built air-conditioned plant also in Almena.

13.     In approximately 2017, SAPUTO changed the personal protective gear ("PPG") MARKGREN had to wear when cleaning his machines.  Prior to 2017, the PPG consisted of a face shield, gloves and a light disposable apron.  In 2017, the new PPG included a face shield, gloves and a full bodysuit including a heavy rubber coat and heavy rubber pants.  The increased weight and restrictive air flow caused MARKGREN to get light-headed and dizzy while wearing the PPG.  MARKGREN told his supervisor, Shann Munson ("Munson") and Tammy Bertelsen ("Bertelsen"), SAPUTO'S Health & Safety Specialist, this was happening and the adverse effects it was having on his heart and health.  MARKGREN asked for better ventilation in his work area.  Bertelsen's only recommendation was that MARKGREN should take more breaks while cleaning his machine; however, this was not possible because clean up lasted from 6:00 a.m. until 11:00 a.m. without a break and cheese production resumed again at approximately 11:30 a.m.  If MARKGREN had taken more breaks, he would not have gotten his machine and work area cleaned sufficiently before production resumed.  Another option, which Bertelsen ignored, was to allow MARKGREN to wear the lighter PPG which he'd worn prior to 2017 while cleaning his machine and work area.  Munson also knew the heavier, non-breathable safety gear was not good for MARKGREN'S heart and would occasionally help him clean his area;

Complaint for Damages Based On Age Discrimination,  Reverse Gender Discrimination etc.

5

however, she did not do so daily.  Nor did she speak with Bertelson or Human Resources regarding what other accommodations SAPUTO could have made available to MARKGREN to address MARKGREN'S heart condition/disability while MARKGREN was wearing the PPG and/or the temperature was extremely high in the plant.

14.     Beginning approximately six months prior to his back surgery in November 2018, until the time MARKGREN went on family leave for the surgery, MARKGREN asked Bertelsen to change the CIP pan under the tower which was part of the system to wash out the tower.  It was one large heavy pan which was difficult for any person to maneuver by themselves but was especially difficult for MARKGREN with his back disability and sciatica. Despite his many requests, Bertelsen never changed the pan before MARKGREN went on leave or while he was out on leave.  When MARKGREN returned from leave in 2019, the larger, heavy pan was still there.  MARKGREN spoke with Bertelsen who said they'd have to begin at square one to figure out what to do.  MARKGREN objected and immediately spoke with the then Plant Manager, Cesar Compean ("Compean").  Within two weeks the one single pan was replaced with two lighter pans which worked quite well.  Given the ease with which the pans were changed, MARKGREN did not understand why Bertelsen had not changed the pans prior to his surgery.

15.     In July 2018, MARKGREN went to the emergency room complaining of dizziness, being clammy, sweaty and weak.  The temperature in the plant was 107 degrees that day with no air conditioning. He went out on a family medical leave starting on or about August 2, 2018 because his cardiologist enrolled him in a specialized cardiac program that lasted for approximately two months.  In mid-November 2018, MARKGREN underwent major back surgery for anterior and posterior lumbar fusion with decompression and laminectomy.  In December 2018, the doctors found an aortoiliac aneurysm.  He returned to work in approximately April-May 2019.

16.     At all times, MARKGREN provided the requested medical and leave information and releases to return to work to Human Resources including but not limited to Joetta Nyhus ("Nyhus"), Sorey or Julia Schurman ("Schurman").  Management, including his immediate supervisor Munson, Bertelsen as the Health and Safety Specialist, Jim Burdick ("Burdick"),

Complaint for Damages Based On Age Discrimination,  Reverse Gender Discrimination etc.

6

Production Supervisor and his former manager, Gary Mathison ("Mathison"), were aware of and knew about MARKGREN'S heart and back disabilities as well as his depression. They also knew that he'd requested reasonable accommodations and took time off for family/medical leaves of absences. MARKGREN'S manager in December 2019, David Miller ("Miller"), also knew of MARKGREN'S disabilities, requested accommodations and family leaves of absences. They all also knew that MARKGREN continued to take prescribed medications for his heart condition, high blood pressure and depression. Nyhus estimated that MARKGREN'S medical file was approximately 4 inches thick. Suddenly, that file is missing.

17.   From approximately mid-2017 until he was wrongfully terminated, MARKGREN was harassed by three much younger employees at work Anthony Selkow ("Selkow"), Matt Olson ("Olson") and/or Dylan Skow ("Skow"). Each were in their late twenties to early thirties. The harassment occurred anywhere from twice a month to weekly when MARKGREN would return to work, whether after his regular days off, vacation or his family leaves of absence. They harassed him by messing with his PPG or near the end of his employment, by filling his locker with hangers. His PPG was hung on a rack in the make room and had his name on each piece. Most of the time some of his PPG would be missing whether it was his face shield, protective coat, pants or gloves. At other times, his lock out tags, again with his name on them, would be missing. One time, MARKGREN had bolted his lock out tags so no-one could take them, yet the employees cut through the bolt to steal the tags. With any of these items missing, MARKGREN could not fully perform the duties and responsibilities of his job until they were replaced. The tags were especially important for his safety on the job. Without them, MARKGREN could not tag out of a cheese production machine after it plugged up or when he routinely cleaned the machine on each shift which meant the augers or blowers could restart while he was removing the plugged cheese. On at least two other occasions in later 2019, MARKGREN found his locker full of hangers. The second time they were so entangled that MARKGREN could not open the locker door.

18.   MARKGREN informed Munson as his supervisor each time his gear, tags or locker were missing or tampered with. MARKGREN also told Munson that he suspected the

three younger employees, Selkow, Olson and Skow, of taking his belongings or putting the hangers in his locker.  Munson always told MARKGREN she'd look into it or pass it on to Human Resources. The last hanger incident occurred in either late November or early December 2019.  When MARKGREN reported the harassment to Munson, especially as time progressed and the harassment was not abating, he told her that it was getting to him, he was becoming frustrated because it wasn't happening to anyone else and he didn't understand why it kept happening.  He also told her it was bothering him so much that it was increasing his anxiety levels and negatively affecting his heart.  He implored Munson to end the harassment because it was not good for his health.  Munson repeatedly assured MARKGREN that she'd look into the harassment.

19.     MARKGREN never believed that either Munson or Human Resources investigated his harassment complaints because no-one ever got back to him with any results of any investigation and the harassment continued.  The only thing MARKGREN witnessed was Munson telling the shift employees that the taking of protective gear or lock out tags was unacceptable.  She only did this about 3-4 times over the two a half year period the harassment was happening.  The announcements had absolutely no impact as the harassment continued.

20.     On December 23, 2019, MARKGREN cleaned out cheese from the tower from one of the machines in the lower make room.  He used the same procedure he'd been taught by his earlier supervisor, Dual Spurlock.  It was also the same procedure he'd been performing through-out his 32 years of employment.  Of note, no safety protocol or lock out instruction had been written up regarding the door leading to the tower as it rarely ever got plugged.  It was also nowhere near the augers as they were in separate shoots and the doors to them were closed.  To clean the shoot, an operator's arms and hands were never physically in the shoots.  Bertelsen and Munson confirmed that no safety protocol or lock out instruction had been written up about the door leading to the tower.  Despite this, SAPUTO accused MARKGREN of violating its alleged lockout-tagout policy and used it as one of the reasons to terminate MARKGREN days later.

21.     On December 28, 2019, the tower in the filler machine plugged up on the shift before MARKGREN came in.  When he arrived, MARKGREN assisted the previous operator in

Complaint for Damages Based On Age Discrimination,  Reverse Gender Discrimination etc.

8

cleaning out the cheese.  When that operator's shift was finished, MARKGREN continued cleaning the machine by himself.  Skow came down to investigate what was going on but in violation of company protocol, turned and walked away without assisting MARKGREN with unplugging the machine.  MARKGREN, by himself, shut down the machine, locked out the augers and unplugged the machine.

22.     After the machine was cleared, MARKGREN started cleaning up the cheese that had fallen to the floor.  He turned on one hose on the south wall of the make room for water then went to turn on a second hose.  When he returned to the machine, the first hose had been turned off.  Selkow was standing there with pliers in his pocket, which were required to turn the hose off.  MARKGREN asked Selkow if he'd turned off the first hose.  Selkow denied he'd turned the water off.  Because no-one else was present and the pliers to turn the hose off was in Selkow's pocket, MARKGREN asked him a second time why he'd turned the water off.  Selkow continued to deny that he turned the water off.  While MARKGREN was speaking with Selkow, Skow walked up and began raising his voice and yelling at MARKGREN to return to the other end of the building.  MARKGREN asked Skow why he was so angry towards him but Skow only continued yelling.  MARKGREN turned and walked to the other end of the building.  SKOW continued yelling even as MARKGREN walked away.

23.     Because Skow had not helped him clean the machine and the subsequent interchange with Selkow and Skow was intense, mean spirited and malicious and because MARKGREN believed they'd been harassing him for years, MARKGREN became extremely upset, started shaking and his heart started racing.  He began sweating and was getting clammy. He called Munson and told her that Selkow and Skow were purposefully trying to upset him and that he needed to leave because his heart was racing, he was sweating, he didn't feel right and it was not safe for him to stay at work because of his heart.  He was extremely afraid he'd have another heart attack at work.  He was beginning to panic.  He also told Munson that he'd return to work the next day but had to leave then.  Munson told him to "go".  Munson herself noted MARKGREN was physically shaking.  MARKGREN turned and walked away, avoiding Selkow who was carrying a cheese form.

24.     Of note, the walkway between machines was extremely narrow.  Prior to his physically leaving the plant, Munson found MARKGREN and asked him if he'd bumped into Skow as he was leaving.  MARKGREN said no, not to his knowledge.  He also explained that he'd turned side-ways to avoid Selkow who was carrying a form and the work area was very narrow.  To his knowledge, he did not touch Skow while he was turning to avoid Selkow.  Munson telephoned MARKGREN later in the day telling him not to return to work the next day because Human Resources was looking into what had happened.

25.     Later that same day, someone from Human Resources also called MARKGREN and simply asked him what had happened.  MARKGREN relayed that the machine had plugged up, he'd cleaned it out, started cleaning up the excess cheese that had fallen to the floor including by starting the first hose, going to start the second hose and returning to find the first hose turned off.  He then explained the exchange between himself, Selkow and Skow which caused his heart to race, he was getting sweaty and clammy and had to leave because he was extremely anxious that he'd suffer another heart attack.  He also told her that Munson had approved his leaving for the day under the circumstances.  During this conversation, MARKGREN was not asked any questions about whether or not he'd bumped into Skow as he was leaving.

26.     On December 29, 2019, Schurman also telephoned MARKGREN and asked him what had happened the day before.  MARKGREN told her the tower had plugged, Selkow had shut off the hose and Skow had been yelling at him.  MARKGREN also told her that he'd had to leave because the harassment was adversely affecting his heart causing him to not feel well, he'd been sweating profusely and his heart was racing.  He told her that it was not good for him to be in the continuing work environment with his heart condition and Munson approved him leaving under the circumstances.  Again, MARKGREN was not asked any questions about whether or not he'd bumped into Skow as he was leaving much less about any of the other false allegations Skow filed against him.

27.     On December 31, 2019, SAPUTO wrongfully terminated MARKGREN for false and illegitimate reasons.  SAPUTO alleges that it terminated MARKGREN for violating safety

protocol on December 23, 2019 and for allegedly initiating a verbal and physical altercation with Selkow and Skow on December 28, 2019.  MARKGREN denies both of these allegations. Further, MARKGREN was never told that Skow had complained about what had happened including that he'd intentionally bumped into him as he was leaving causing Skow to fall.  As such, MARKGREN was never given a full opportunity to deny that he had or that if he had, it was an accident because he was panicking because of his heart, in a hurry to leave and the walkway was extremely narrow.  Indeed, SAPUTO'S alleged investigation into both incidents was false and facile, blatantly failing to provide MARKGREN with the details of what Selkow and Skow alleged so he could tell his version of what had happened.  SAPUTO also ignored statements and/or witnesses who could corroborate MARKGREN'S statements of what happened including that there was no physical contact between MARKGREN and Skow as MARKGREN was leaving. Even Munson wrote of the incident that "it looked like a show of being mad", referring to Skow.

28.     The four individuals who made the decision to terminate MARKGREN, Schurman, Jennifer Ellefson ("Ellefson"), Lisa Housner ("Housner") and Miller, were anywhere from 8 to 14 years younger than MARKGREN.  MARKGREN was also replaced by a twenty-something inexperienced female and later by a thirty-four-year-old male.  Selkow, Skow and Olson, who were much younger than MARKGREN, remained employed despite their repeated harassment of MARKGREN for two and a half years including on December 28, 2019.

29.     STROHSCHEIN began his employment in April 1984 as a machine operator at Twin Town Cheese Factory which later became SAPUTO.  He was promoted to a supervisory position in 2008.  In 2017, he was transferred from the old to the new plant which became operational in late 2017.  In 2017, while constructing the plant, STROHSCHEIN worked closely with ALPMA (Alpenland Maschinenbau GmbH), the company who built and installed the cheese making machinery.  Thus, he gained an integral knowledge of how the machines operated which allowed him to later assist maintenance in repairing the machines.  STROHSCHEIN'S date of birth is June 25, 1965.  He was employed by SAPUTO and its predecessors for 36 years.

30.     Beginning in 2017, STROHSCHEIN was the Blue Cheese Production Supervisor on the PM shift in the new plant.  The Production Supervisor position at SAPUTO, especially in the new plant, was complex.  Eight operators reported to the supervisor and together, they ran 13 different large, complex and automated machines spread out over approximately 150,000 square feet.  Besides managing the employees and the machines, the supervisor also monitored 21 aging cells for proper temperature and conditions.  He'd also operate a machine if need be and coordinated any repairs with maintenance.

31.     Once promoted, STROHSCHEIN received positive feedback about his performance including in written reviews by his previous manager, Tom Ingham ("Ingham").  As he progressed as a supervisor, so did his opportunities including training staff, reducing waste and traveling to Big Stone to learn more about the aging and packaging processes for the cheese made in Almena.

32.     On November 11, 2019, STROHSCHEIN attended a meeting between himself, Jerrold Featherly ("Featherly"), the new Production Manager, and Miller, the new Plant Manager.  Featherly and Miller were in their early to mid-forties so were several years younger than STROHSCHEIN.  During this meeting, Miller alleged STROHSCHEIN had not properly performed his job on four instances.  STROHSCHEIN refuted the allegations verbally while also admitting that on one occasion identified he should have completed a Product Incident Report ("PIR") form even though he had informed maintenance of the problem.  When leaving, Featherly told STROHSCHEIN he didn't feel good about the discussion.  Neither did STROHSCHEIN given Miller had only recently become the Plant Manager, he rarely walked through the plant especially on the night shift when STROSCHEIN worked and the interactions between Miller and STROHSCHEIN had been few and short.  Thus, STROSCHEIN felt that Miller did not have an understanding of his performance.  Of import, STROHSCHEIN was never given a copy of this alleged "Record of Discussion" and therefore, was never able to refute the allegations in writing.

33.     In approximately early 2020, Featherly, during a supervisors meeting, instructed the supervisors not to go into and change the register, the key to the computerized processing

1   system.  He then looked directly at STROHSCHEIN and said to all present that STROHSCHEIN

2   knows how to fix the register.  Indeed, STROHSCHEIN had been doing so since 2019.  Based

3   on Featherly's comment, STROHSCHEIN understood that Featherly was giving him the go

4   ahead to still go in and change the register.  On two occasions after that meeting, Featherly

5   himself was on the production floor and instructed STROCHSCHEIN to change the register

6   because it was out of sync.  In response, STROHSCHEIN went into the register and changed the

7   value or took out an incorrect value so the processing equipment would run again. Thereafter, if

8   needed, STROHSCHEIN would change the register, fixing the problem so the equipment ran

9   fine.  Of note, Susan Bever ("Bever"), the Day Shift Production Supervisor also continued to

10  change the register as needed on her shift. Each supervisor had their own log in identification

11  and therefore, SAPUTO would have known when any of the supervisors went into and changed

12  the register.  Although these identifications were initially taken back from the supervisors,

13  Featherly returned STROHSCHEIN'S identifications to him, again leading him to believe he

14  could change the register.  On information and belief, Bever's log in identification was also

15  returned to her.

16          34.     On March 6, 2020, the Coagulator, "Coag" for short, went down on the night

17  shift.  The issue was with the plate.  The Coag was approximately 300 feet long and was the

18  largest such machine in the nation.  Because of its complexity, the Coag would often just stop

19  working.  STROHSCHEIN and the operator, Tom Lefstad ("Lefstad"), worked together to fix

20  the issue by raising and lowering the plate for not more than five minutes hoping the problem

21  would be resolved as they'd successfully done in the past.  They did *not* move the plate in and

22  out.  Because the issue was not resolved, STROHSCHEIN immediately notified Dan Lehman

23  ("Lehman") in maintenance.  Lehman arrived with another maintenance employee, Dan Capuzzi

24  ("Capuzzi").  For the next 40-45 minutes, Lehman, with the assistance of STROHSCHEIN, tried

25  to fix the machine while Capuzzi primarily watched.  The machine locked up after Lehman had

26  instructed STROHSCHEIN to remove the plate.  Lehman called Cybertrol, the tech company

27  who assisted in resolving system problems. STROHSCHEIN texted Featherly who arrived

28  approximately 30 minutes later.  Featherly took over fixing the Coag machine with maintenance

Complaint for Damages Based On Age Discrimination,    Reverse Gender Discrimination etc.

13

—

1   and STROHSCHEIN left the machine to work elsewhere in the plant.  The Coag machine began

2   working around 10:00 p.m. and Featherly left the plant.  The Coag went down again about 30

3   minutes later.  STROHSCHEIN again notified FEATHERLY who returned to the plant and

4   resumed working on the machine with maintenance.  The Coag started operating around

5   approximately 7:00 a.m., after STROHSCHEIN'S shift ended and he'd left the plant.

6       35.     On March 7, 2020, STROHSCHEIN arrived at 4:00 p.m., the start of his shift.

7   The Coag was working but STROHSCHEIN and his crew had to clean up the bad cheese from

8   the night before.  Then the turner and filler machines had minor problems.  Maintenance was

9   called and the machines were repaired.  Processing was approximately 30 minutes behind

10  schedule.  STROHSCHEIN kept Miller apprised via text.  At 4:00 a.m., when the shift ended,

11  STROHSCHEIN informed Bever, the female supervisor on the day shift who came in to relieve

12  STROHSCHEIN, that the turner machine had lost about 30 minutes earlier in the shift but the

13  time had been made up.  As they were talking, a young female operator, Kiaya Carranza

14  ("Carranza"), informed STROHSCHEIN and Bever that the 414 tunnel which she operated, was

15  not turning.  STROHSCHEIN and Bever together went to the control screen and saw the tunnel

16  had not turned for about 290 minutes or almost 5 hours.  This meant that Carranza had not been

17  properly monitoring the control screen as she should have noticed hours earlier that the tunnel

18  had not been turning.  STROHSCHEIN recommended Bever contact maintenance which she did.

19  Of note, the 414 tunnel going down was unrelated to the Coag machine going down on March 6,

20  2020.

21      36.     On March 8, 2020, when STROHSCHEIN arrived on his shift, production was

22  approximately 3-4 hours behind.  STROHSCHEIN informed Featherly of this and expressed

23  concern that the Coag might go down again.  STROHSCHEIN then requested he be able to shut

24  the production line down here and there so the Coag would not go down.  Featherly approved

25  STROHSCHEIN shutting down early if they ran into more machine problems.  Because there

26  were no machine problems that shift, STROHSCHEIN kept everything running.  The following

27  morning, STROHSCHEIN told Dale Buck ("Buck"), the day supervisor who relieved

28  STROHSCHEIN that day, that Featherly had approved shutting down early if they began to run

into problems.  Buck also kept the line running and did not shut down early.  On March 11th, when STROHSCHEIN returned to work after his days off, Featherly, in opposite of what he'd told STROHSCHEIN on March 8th, told STROHSCHEIN he should've shut down early on the 8th so the cheese making could start up on time the next shift.

37.     On March 8, 2020, during the shift, a female employee, Cassandra Miller ("C. Miller"), informed STROHSCHEIN that she'd received a minor burn.  STROHSCHEIN inspected the burn and offered first aid which C. Miller refused.  STROHSCHEIN instructed C. Miller to meet him at the end of the shift to complete the requisite safety forms. STROHSCHEIN waited for C. Miller at the end of the shift but she did not show up.

38.     STROHSCHEIN did not work on March 9th or 10th.  On March 11, 2020, STROHSCHEIN met with Schurman and Featherly.  The three discussed the events between March 6-8, 2021.  STROHSCHEIN reminded them that it was Lehman who'd made the decision to manually retract a plate on the Coag machine, not he.  He also told them that he told Lehman he didn't think it was a good idea to move the plate because when you manually move something the register would be off.  Schurman told STROHSCHEIN that "he let it happen". STROHSCHEIN disagreed because he had no management authority over the maintenance employees and once Lehman arrived at the Coag machine on the 6th, he'd followed Lehman's. Furthermore, Featherly had always told him that once a maintenance issue was turned over to maintenance, it was their responsibility, not production's.  Schurman and Featherly also threw allegations at STROHSCHEIN of which he knew nothing, including but not limited to, that the motor on the stacking machine had gone down and that he he'd been freely changing the register on March 6th while maintenance was trying to fix the Coag.  STROHSCHEIN told them that he knew nothing about the motor on the stacking machine and that he never changed the register on the 6th.  It was apparent to STROHSCHEIN that management would make him take the fall for the events between March 6-8, 2021.  STROHSCHEIN maintains that he followed company protocol and trainings at all times between March 6-8, 2021.

39.     STROHSCHEIN was then placed on administrative leave and terminated on March 16, 2020.  At the time, he was not given any reasons as to why he was terminated.

Subsequently, SAPUTO contends STROHSCHEIN was terminated for failing to follow company policies and rules between March 6-8, 2020.

40.     STROHSCHEIN was 54 almost 55 years of age at the time.  The decision-makers, Schurman, Ellefson (HR Generalist under Schurman in plant) and Featherly were 42 years of age and Miller was 46-47 years of age.   Lehman and Capuzzi, both maintenance employee who worked on the Coag machine on March 6, 2021, were in their thirties and they remained employed.  Of note, SAPUTO "lost" the original statement written by Lehman wherein he accepted responsibility for moving the plate on the Coag machine.  Carranza, a younger female operator, also remained employed though she didn't check the monitor for her machine for almost 5 hours resulting in it going down.

41.     STROHSCHEIN was replaced by a younger male employee who was either 36, 39 or 42.  Bever, a female supervisor, failed to complete the requisite PIR form in November 2019 at the time the 701 washer wasn't up to the required temperature and she was the supervisor on shift when it happened.  She also continued to change the register after being instructed not to do so which were similar accusations as those which SAPUTO leveled against STROHSCHEIN.  Yet, Bever remains employed.

42.     On information and belief, SAPUTO has a pattern and practice of terminating other older employees without cause including but not limited to Gordon Garske ("Garske"), MARKGREN and STROHSCHEIN.

43.     On information and belief, SAPUTO also has a pattern and practice of treating younger and female employees more favorably than it did older, male employees including MARKGREN and STROHSCHEIN.

44.     Of great concern also, SAPUTO did not follow its progressive disciplinary system with either MARKGREN or STROHSCHEIN before terminating them which was its pattern and practice to do.  This was especially important given each had worked for SAPUTO for more than 30 years.

/ / /

/ / /

# FIRST CAUSE OF ACTION

## DISCRIMINATION BASED ON AGE
### the violation of the
## Age Discrimination In Employment Act as set forth in 29 U.S.C. §§ 621-634

### PLAINTIFFS MARKGREN and STROHSCHEIN

### AGAINST DEFENDANT SAPUTO

45.     MARKGREN and STROHSCHEIN repeat and re-allege the allegations set forth in paragraphs 1 through 44, inclusive, of this Complaint.

46.     Defendant SAPUTO discriminated against MARKGREN and STROHSCHEIN on the basis of their age in violation of the Age Discrimination in Employment Act ("ADEA") when SAPUTO, through its Human Resources and Management personnel, including Schurman, Ellefson, Housner, Featherly and Miller, wrongfully terminated MARKGREN and STROHSCHEIN without first following the company's progressive disciplinary policies and procedures and by terminating them both for false reasons.

47.     MARKGREN, who'd been employed since 1987, was terminated without any recent and previous warnings. STROHSCHEIN, who'd been employed since 1984 and hadn't received any counseling for years, disagreed with the accusations verbally made against him in November 2019 and refuted the majority of them.  Neither of them received any type of counseling prior to their terminations based on the events for which SAPUTO alleges they were terminated.  Both MARKGREN and STROHSCHEIN had each been employed for over 30 years and had been performing the duties and responsibilities of each of their positions.

48.     Furthermore, both MARKGREN and STROHSCHEIN disagreed with the reasons they were allegedly terminated.  Neither were given a full and complete opportunity to refute the allegations against them and SAPUTO'S investigations into the events allegedly leading to their respective terminations were false and facile.  SAPUTO did not talk to witnesses who would corroborate MARKGREN'S or STROHSCHEIN'S versions of what had happened and ignored testimony by witnesses who refuted the false accusations against them.

49.     MARKGREN did not violate any lock out procedure on December 23, 2019 because there was none as agreed to by his supervisor, Munson.  He also did not initiate an altercation between himself and Skow or Selkow on December 28, 2019 as confirmed by Munson and another employee present but whom SAPUTO never interviewed, Doug Strohschein.

50.     STROHSCHEIN disagreed with the four allegations against him during his meeting with Miller and Featherly in November 2019 and verbally informed them as to why the majority of their representations were false.  He did admit that in response to one incident, he should have completed the PIR form though he'd gotten maintenance to fix the machine problem.  STROHSCHEIN was never given a copy of the Record of Discussion containing the incidents and was never given an opportunity to adequately refute the false allegations contained therein in writing.  STROHSCHEIN also disagreed that he'd violated company policy and procedure between March 6-8, 2020.  Ironically, SAPUTO "lost" the one corroborating witness statement given to it by Lehman, the younger maintenance employee, who'd initially written that he'd made the decision to remove the plate from the Coag machine, not STROHSCHEIN.

51.     Furthermore, both MARKGREN and STROHSCHEIN were replaced with an individual who was substantially younger than themselves.  MARKGREN'S immediate replacement was a female approximately in her twenties.  STROHSCHEIN was replaced by a male employee who was between 36 and 42 years of age.

52.     Also, the decision-makers who terminated both were anywhere from 8-14 years younger than MARKGREN and STROHSCHEIN.  MARKGREN who was 55 years old when he was wrongfully terminated and STROHSCHEIN was 54 almost 55.

53.     SAPUTO also retained other employees who committed the same or more egregious acts than either MARKGREN and/or STROHSCHEIN including but not limited to Selkow, Skow, Olson, Lehman, Capuzzi, Carranza, Matt Holten ("Holten"), Jeremy Raffesberger ("Raffesberger"), Bever and others. MARKGREN and STROHSCHEIN believe there are other younger employees who SAPUTO has retained though they committed the same or more egregious acts than they.

54.     SAPUTO is an entity subject to suit under the ADEA in that it is an employer who regularly employs 20 or more persons.  It engaged in a pattern and practice of discriminating against employees, including MARKGREN and STROHSCHEIN, on the basis of their protected categories, including their age, in violation of the ADEA by engaging in the course of conduct set forth above.  Examples of other older employees who were terminated or who were constructively terminated from their employment, on information and belief, include Gordon Garske, who was 60 years old at the time, and Nyhus, SAPUTO'S former Human Resources Manager.

55.     As a proximate result of SAPUTO'S conduct, MARKGREN and STROHSCHEIN have suffered and will continue to suffer substantial losses incurred in earnings and other employment benefits they would have received had SAPUTO not taken such adverse employment action against them.  SAPUTO willfully violated the ADEA and showed a reckless disregard towards MARKGREN and STROHSCHEIN because of their ages.  As such, each was damaged in an amount to be ascertained at trial, including, but not limited to compensatory damages.  They are also entitled to attorneys' fees and costs.  All of which will be determined according to proof, and as provided by 29 U.S.C. §§ 216(b) and 626(b).

56.     Said acts were committed maliciously, fraudulently and oppressively, with the wrongful intent of injuring MARKGREN and STROHSCHEIN and with an improper evil motive amounting to malice and therefore, each is entitled to liquidated damages commensurate with Defendant's wealth, and as otherwise set forth under the ADEA which incorporates damages from the Fair Labor Standards Act 29 U.S.C. §201; 29 U.S.C. §216.

WHEREFORE, MARKGREN and STROHSCHEIN request relief as hereinafter provided.

## SECOND CAUSE OF ACTION

### HARASSMENT BASED ON AGE
### IN VIOLATION OF THE AGE DISCRIMINATION IN EMPLOYMENT ACT

### PLAINTIFF MARKGREN

### AGAINST DEFENDANT SAPUTO

57.     MARKGREN and STROHSCHEIN repeat and re-allege the allegations set forth in paragraphs 1 through 56, inclusive, of this Complaint.

58.     During the last two and one-half years MARKGREN was employed by SAPUTO, it engaged in a continued course of conduct with the intent of harassing MARKGREN on the basis of his age.  SAPUTO did so by ignoring MARKGREN'S weekly or bi-weekly complaints to his supervisor, Munson, that three much younger employees were repeatedly taking, discarding and/or damaging his tag out cards or PPG including his face shield, protective coat, pants and gloves.  On one occasion, these younger employees even cut through the bolt MARKGREN had brought in to secure his gear.  In later 2019, they also stuffed hangers in MARKGREN'S locker on at least two occasions.  The second time he couldn't open his locker because the hangers were so entangled.

59.     Each time MARKGREN'S gear or tags were missing or he found hangers in his locker, MARKGREN found Munson as his supervisor to show her what had happened and replace his gear.  The time it took to find Munson, show her what happened and then have his gear replaced, delayed the start of MARKGREN'S shift because he could not work without his gear or lock-out tags given they were essential for his safety on the job.  MARKGREN repeatedly told Munson that he believed that Selkow, Olson and Skow were the individuals responsible for this harassment because the harassment didn't start until after they were employed and only happened when they were at work.  He also repeatedly told Munson that the harassment was adversely affecting him emotionally and physically including that his anxiety levels were steadily increasing causing him to worry about his heart when he was at work.

60.     SAPUTO allowed this harassment of MARKGREN to continue for two and a-half years because Munson never fully investigated who was removing or damaging MARKGREN'S PPG or lock out tags and putting hangers in his locker.  Though Munson instructed the shift employees to stop doing this on 3-4 occasions during this two and a-half year period, they never did.  Moreover, though Munson promised MARKGREN she'd take care of the problem, on information and belief, Munson never informed Human Resources.  Nor did anyone conduct a formal investigation to determine who was doing the harassment much less end it.  Because Munson told MARKGREN that she would take care of things, he never himself spoke with Human Resources or filed a formal complaint.

61.     The harassment peaked on December 28, 2019.  First, Skow refused to help MARKGREN remove the cheese from his machine in violation of company policy.  Second, Selkow turned the first hose off as MARKGREN was cleaning the cheese that had fallen to the floor.  Third, after MARKGREN asked Selkow if he'd turned the water off, Selkow repeatedly denied it though he had the pliers in his pockets which were used to turn the hose off.  Fourth, in the midst of MARKGREN'S discussion with Selkow, Skow approached and began yelling at MARKGREN until MARKGREN walked away.

62.     Because the situation that day had escalated and because Selkow's and Skow's harassment had been continuing for over two years, MARKGREN became so upset he was getting anxious, was shaking and sweating.  MARKGREN called Munson and told her he had to immediately leave because he was worried about his heart and indeed, that he might have another heart attack. Munson let him leave.

63.     Unbeknownst to MARKGREN, Skow complained that MARKGREN had intentionally knocked him over as he was leaving.  Munson herself wrote that "it looked like a show of being mad".   Further, another employee was present, Doug Strohschein, who was never interviewed by SAPUTO.  This is important because he would have told them that there was no bodily contact between MARKGREN and Skow as MARKGREN was leaving and if there had been, it was because the walkway was very narrow.  Indeed, SAPUTO ignored the evidence showing that MARKGREN had not deliberately knocked Skow into a rack of cheese or made him fall as Skow falsely alleged.  SAPUTO also ignored the on-going malicious behavior of Selkow and Skow towards MARKGREN.

64.     SAPUTEO also condoned the harassment of MARKGREN by Selkow and Skow and Olson by ignoring the years that MARKGREN had told Munson that he was being harassed by them.  Instead, they falsely terminated MARKGREN for the incident.  MARKGREN believes he was terminated because of his age and disabilities.

65.     As a proximate result of SAPUTO'S conduct, MARKGREN has and will continue to suffer damages, including, but not limited to, lost salary and benefits of employment, Further, MARKGREN was damaged in an amount to be ascertained at trial, including, but not

Complaint for Damages Based On Age Discrimination,    Reverse Gender Discrimination etc.

21

limited to compensatory damages and attorneys' fees and costs, according to proof, and as provided by 29 U.S.C. §§ 216(b) and 626(b).

66.    Said acts were committed maliciously, fraudulently and oppressively, with the wrongful intent of injuring MARKGREN and with an improper and evil motive amounting to malice.  Therefore, MARKGREN is entitled to liquidated damages or other remedies as provided under the ADEA which incorporates remedies from the Fair Labor Standards Act.

WHEREFORE, MARKGREN requests relief as hereinafter provided.

### THIRD CAUSE OF ACTION

**REVERSE GENDER DISCRIMINATION**

**In Violation of Title VII**
**42 U.S.C. §§ 2000e et seq.**

**PLAINTIFFS MARKGREN AND STROHSCHEIN**

**AGAINST DEFENDANT SAPUTO**

67.    MARKGREN and STROHSCHEIN repeat and re-allege the allegations set forth in paragraphs 1 through 66, inclusive, of this Complaint.

68.    MARKGREN and STROHSCHEIN were at all times material hereto employees, as defined with 42 U.S.C. § 2000e(f) under Title VII which prohibits discrimination, harassment and retaliation in employment based on one's sex/gender.

69.    Defendant SAPUTO is and was at all times material hereto an employer within the meaning of 42 U.S.C § 2000e(b).  As such, Defendant SATPUO is barred from discriminating in any term, condition or privilege of employment including on the basis of an employee's sex/gender and from retaliating against an employee on the same basis.

70.    Defendant SAPUTO reversely discriminated against MARKGREN and STROHSCHEIN on the basis of their sex/gender in violation of 42b U.S.C. § 2000e et seq. when, Defendant SAPUTO failed to properly investigate the allegations made against MARKGREN and STROHSCHEIN.  Instead, SAPUTO conducted biased, false and facile investigations against MARKGREN for the December 23, 2019 and December 29, 2019 incidents and against STROHSCHEIN for the March 2020 machinery shut-downs.  SAPUTO did not allow either

MARKGREN or STROHSCHEIN an opportunity to fully address the accusations against them or provide witnesses in their support.  In this respect, Schurman and her female staff in Human Resources, Ellefson and Housner, did not perform their duties and responsibilities to the detriment of two long term male employees resulting in MARKGREN'S and STROHSCHEIN'S wrongful discriminatory terminations.  Yet, all three females remained employed.

71.     Defendant SAPUTO also discriminated against MARKGREN and STROHSCHEIN because MARKGREN and STROHSCHEIN were fully performing the duties and responsibilities of their respective positions and neither of them did the actions of which they were accused immediately prior to their terminations yet they were terminated.  Indeed, the allegations against MARKGREN by Skow and Selkow were false and malicious and SAPUTO knew this given MARKGREN had told Munson for 2.5 years that he believed they were the employees harassing him and Munson herself did not support Skow's complaints against MARKGREN.  Likewise, the allegations against STROHSCHEIN were exaggerated with SAPUTO losing the very statement that Lehman had written wherein he stated that it was his decision to remove the plate from the Coag machine and not STROHSCHEIN.  In both instances, SAPUTO failed to speak with witnesses who would have corroborated MARKGREN'S and STROHSCHEIN'S version of what happened.  As such, SAPUTO based its decision to terminate MARKGREN and STROHSCHEIN on false accusations which, if it had properly investigated the allegations, should have known were false or were not sufficiently severe to warrant their immediate terminations.

72.     Defendant SAPUTO also discriminated against MARKGREN and STROHSCHEIN by not terminating other female employees for similar or more egregious conduct.  Indeed, Munson was not terminated despite the fact that for over two years she did not investigate MARKGREN'S claims of harassment by Selkow, Olson and Skow.  Instead, she allowed the harassment of MARKGREN to continue unfettered. She also failed to work with MARKGREN to find reasonable accommodations for him on the job because of his disabilities or stand up for him regarding the December 28, 2019 incident despite the fact that she was present when MARKGREN walked off the floor.

73.     Likewise, Bever, who was the day-shift production supervisor in the new plant and who was STROHSCHEIN'S counter-part, had (a) failed to complete a PIR form in November 2019 in compliance with company policy requiring she do so because she was the supervisor on duty at the time the 701 washer wasn't up to the required temperature and she could describe what was happening; and (b) routinely changed the register after being instructed not to do so.  Of important, SAPUTO would have had a record of Bever changing the register because she had her own log-in codes.

74.     Thus, SAPUTO discriminated against MARKGREN and STROHSCHEIN in a reverse manner based on their sex/gender. SAPUTO also replaced MARKGREN with a young female who had no experience and who he himself was training in 2019.  So also, the female employees in Human Resources all remained employed despite their inept and biased investigations into the incidents leading to MARKGREN'S and STROHSCHEIN'S terminations.

75.     On information and belief, SAPUTO has engaged in a pattern and practice of discriminating against and harassing employees, including MARKGREN and STROHSCHEIN, on the basis of their protected categories, including reversely based on their sex/gender, in violation of Title VII by engaging in the course of conduct set forth above.  Defendant SAPUTO has a pattern and practice of protecting female employees in the workplace to a greater extent than it protects male employees in the workplace, including from false allegations.  Examples include SAPUTO protecting Bever, Bertelsen, Munson, Schurman, Ellefson and Housner.

76.     As a proximate result of SAPUTO'S conduct, MARKGREN and STROHSCHEIN have suffered, and will continue to suffer, substantial losses incurred in earnings and other employment benefits each would have received had Defendant SAPUTO not taken such adverse employment action against them.

77.     Further, and as a proximate result of Defendant SAPUTO'S conduct, MARKGREN and STROHSCHEIN have suffered, and will continue to suffer, emotional distress damages including anxiety, depression, much lowered self-esteem, humiliation, physical weight gain, sleeplessness and other emotional distress in an amount according to proof.  MARKGREN'S

1  sudden, wrongful and humiliating termination has also adversely affected his disabilities including

2  his heart condition, high blood pressure and severe depression.

3      78.    MARKGREN and STROHSCHEIN are informed and believe that Defendant

4  SAPUTO'S actions, as set forth above, were motivated by animus towards MARKGREN and

5  STROHSCHEIN based on their sex/gender.  Said acts were committed maliciously, fraudulently

6  and oppressively, with the wrongful intention of injuring MARKGREN and STROHSCHEIN, and

7  with an improper and evil motive amounting to malice.  Said acts were carried out by managerial

8  employees acting within the course and scope of their employment with Defendant SAPUTO and

9  with the intent to injure MARKGREN and STROHSCHEIN.  MARKGREN and STROHSCHEIN

10  are therefore entitled to recover compensatory and punitive damages commensurate with

11  Defendant SAPUTO'S wealth, and as set forth under 42 U.S.C. § 1981a.

12     79.    As a result of Defendant SAPUTO'S discriminatory acts as alleged herein,

13  including violation of Title VII, MARKGREN and STROHSCHEIN were damaged in an amount

14  to be proven at trial, including, but not limited to, compensatory, general and punitive damages,

15  attorneys' fees and costs, according to proof and as provided by 42 U.S.C. § 1981(a)(2).

16     WHEREFORE, MARKGREN and STROHSCHEIN request relief as hereinafter provided.

### FOURTH CAUSE OF ACTION

**FAILURE TO REASONABLY ACCOMMODATE A DISABILITY AND
PARTICIPATE IN THE INTER-ACTIVE PROCESS
In Violation of the Americans with Disability Act**

**PLAINTIFF MARKGREN**

**AGAINST DEFENDANT SAPUTO**

23     80.    MARKGREN and STROHSCHEIN repeat and re-allege the allegations set forth

24  in paragraphs 1 through 79, inclusive, of this Complaint.

25     81.    At all times herein mentioned, the American with Disabilities Act 42 USC

26  §12101 *et seq* was in full force and effect and binding on SAPUTO.  The ADA requires

27  SAPUTO, as MARKGREN'S employer, to reasonably accommodate an employee with a known

28  physical or mental disability.  The ADA also required SAPUTO, as the employer, to engage in

the inter-active process with MARKGREN to determine what reasonable accommodations were needed by him and implement them accordingly.  The obligation to accommodate an employee's disability is a continuing duty that is not exhausted by one effort.  Within the time provided by law, MARKGREN filed a complaint with the EEOC in full compliance this with section and received a right to sue letter.

82.    For purposes of the ADA, conduct resulting from a disability is considered to be part of the disability, rather than a separate basis for termination.  The link between an employee's disability and his/her termination is particularly strong where it is the employer's failure to reasonably accommodate a known disability that leads to discharge for performance inadequacies resulting from that disability.

83.    From 2012 forward, MARKGREN suffered from several disabilities while he was employed.  In 2012, he developed a serious heart condition which continued through-out his employment.  He went out for heart surgery in May 2012 during which, two stents were placed in his heart.  He returned to work in approximately June 2012.  In July 2013, he fainted at work due to an extremely high working temperature of over 100 degrees Fahrenheit and was having chest pains.  He was transported by EMS to the hospital.  He was diagnosed with coronary artery disease, congested heart failure, hypertension and severe depression.  He went out on short term disability/family leave.  In August 2013, his physician restricted him to working indoors at less than 100 degree Fahrenheit temperature.  From then forward, MARKGREN continued to have a serious heart condition which was exacerbated especially during the summers by working in a non-air-conditioned plant that regularly had temperatures exceeding 100 degrees Fahrenheit.  It was also exacerbated by the 2.5 years of harassment he endured from Selkow, Skow and Olson when they'd repeatedly remove his personal gear or tags.  He also continued to suffer from severe depression.

84.    In 2014, MARKGREN suffered a back strain and was diagnosed with sciatica causing him extreme pain while at work.  In December 2016, he underwent bariatric surgery and returned to work in early 2017.

Complaint for Damages Based On Age Discrimination,    Reverse Gender Discrimination etc.

26

85.     In July 2018, MARKGREN went to the emergency room complaining of dizziness, being clammy, sweaty and weak related to his heart.  He went out on a family leave in August 2018 to attend a specialized cardiac program.

86.     In mid-November 2018, MARKGREN underwent major back surgery for anterior and posterior lumbar fusion with decompression and laminectomy.  In December 2018, the doctors found an aortoiliac aneurysm.  He returned to work in approximately April-May 2019.

87.     At all times, MARKGREN provided the requested medical and leave information regarding his disabilities and accommodations needed at work.  As such, SAPUTO, including his supervisors, managers and human resources representatives, knew of MARKGREN'S disabilities and requested accommodations in the workplace.  Nyhus estimated that MARKGREN'S medical file at SAPUTO was at least 4 inches thick.  Suddenly, that file cannot now be found.

88.     In approximately August 2013, MARKGREN'S physician ordered that he not work indoors when the temperature reached 100 degrees or higher.  MARKGREN relayed this restriction to his supervisor and managers as well as to Human Resources.  Despite this request, SAPUTO continued to require MARKGREN to work in the non-air-conditioned plant including when the temperature exceeded 100 degrees Fahrenheit.  SAPUTO never reviewed alternative working environments for MARKGREN despite his long-term employment.  This failure to comply with MARKGREN'S physician's work restrictions continued through-out his employment.

89.     In 2017, when the new air-conditioned plant became operational, MARKGREN spoke with Sorey in Human Resources asking if he could transfer to the new plant to comply with his physician's work restrictions.  Sorey told MARKGREN that his pay would be docked $2.00/hour if he made the transfer and ultimately, denied his request.

90.     In approximately 2017, SAPUTO also began requiring operators to wear new, heavy and non-breathable PPG.  Because the gear was heavy and did not breath, MARKGREN found it difficult to work while wearing the gear.  When doing so, he'd become extremely hot and tired and his heart would begin racing at an unhealthy speed.   After the new PPG was

Complaint for Damages Based On Age Discrimination,    Reverse Gender Discrimination etc.

27

implemented, MARKGREN met with Bertelsen and asked if different ventilation could be put into his work area.  Bertelsen rejected the request and simply told MARKGREN to take more breaks.  This recommendation was not doable for several reasons which MARKGREN relayed to Bertelsen and Munson including because MARKGREN was only given a window of 4.0 hours daily to clean his machine before the cheese production resumed.  If MARKGREN would have taken breaks as Bertelsen suggested, he would not have finished the cleaning process thereby jeopardizing the quality of the cheese made for the remainder of his shift.  He also would have violated company protocol because his work area would not have remained clean.  Also, the resting time suggestions did not account for the continually high temperature in the plant especially during the summer months.  As such, this was not an option for MARKGREN.  To his knowledge, Bertelsen never relayed his inquiry to increase the ventilation to anyone else at SAPUTO.  He also spoke to Munson about the PPG and the adverse effects it had on his health; however, she did nothing.

91.     After Sory and Bertelsen turned down MARKGREN'S requested accommodations, MARKGREN continued to work in the non-air-conditioned plant even when the temperatures exceeded 100 degrees Fahrenheit.  Though Munson would occasionally help MARKGREN with the cleaning, she did not do so regularly. No one from SAPUTO ever talked to MARKGREN further about any other possible accommodations including but not limited to if anyone could assist MARKGREN on a regular basis with the cleaning and/or he be provided alternative PPG.

92.     Beginning approximately six months prior to his back surgery in November 2018, until the time MARKGREN went on family leave for the surgery, MARKGREN asked Bertelsen to change the CIP pan under the tower which was part of the system to wash out the tower.  It was one large heavy pan which was difficult for any person to maneuver by themselves but was especially difficult for MARKGREN with his back disability and sciatica. Despite his many requests, Bertelsen never changed the pan before MARKGREN went on leave or while he was out on leave.  When MARKGREN returned from leave in 2019, the larger, heavy pan was still there.  MARKGREN spoke with Bertelsen who said they'd have to begin at square one to figure

Complaint for Damages Based On Age Discrimination,    Reverse Gender Discrimination etc.

28

out what to do.  MARKGREN objected and immediately spoke with the then Plant Manager, Compean.  Within two weeks the one single pan was replaced with two lighter pans which worked quite well.  Given the ease with which the pans were changed, MARKGREN did not understand why Bertelsen had not changed the pans prior to his surgery.

93.     For approximately the last 2.5 years of employment, MARKGREN was harassed at work by three younger operators.  They'd take his PPG or lock out tags such that MARKGREN could not start his shift until the item(s) missing was/were replaced.  They also placed hangers in his locker.  Each time this happened, MARKGREN told Munson what had happened and that he thought the three younger operators were doing it.  He also told her that the harassment was bothering him, causing him anxiety and making it an unsafe work environment because of his heart.  Munson knew that MARKGREN was taking medications for his heart condition, high blood pressure and severe depression.  Yet, Munson did nothing to investigate MARKGREN'S complaints, never referred his complaint to Human Resources and never stopped the harassment.

94.     On December 28, 2019, Selkow and Skow created an extremely hostile and adverse working environment for MARKGREN by refusing to help him clean out the machine where the cheese was clogged, shutting off the hose then denying doing so, and then shouting profusely at him.  MARKGREN became very anxious, sweaty and clammy and was worried he'd have a heart attack.  He also had not taken his depression medication for a few days while it was being refilled.  These two disabilities together caused MARKGREN to panic.  Though Munson allowed MARKGREN to leave his shift early that day, SAPUTO terminated him a few days later for allegedly initiating a confrontation between himself, Selkow and Skow.  Despite SAPUTO'S knowledge of MARKGREN'S disabilities, including his heart conditions and severe depression, no-one ever asked him if those disabilities affected his response to the harassment and lies by Selkow and Skow on December 28, 2019.  This was especially important because Selkow, Skow and Olson had been systematically harassing MARKGREN for over two years by repeatedly removing his PPG, lock-out tags or putting hangers in his locker.

95.     Despite the fact that SAPUTO did not fully accommodate MARKGREN'S disabilities and did not fully engage in the inter-active process of determining any accommodations, MARKGREN could and did perform the essential functions of his operator position by daily running his machines and processing cheese.  As an employee, MARKGREN was well respected by his co-workers.  He even trained other employees to run his machine.

96.     As a proximate result of SAPUTO'S conduct, MARKGREN has suffered and will continue to suffer substantial losses incurred in earnings and other employment benefits he would have received had SAPUTO not taken such adverse employment action against him.

97.     Further, and as a proximate result of SAPUTO'S conduct, MARKGREN has suffered and will continue to suffer, emotional distress damages including anxiety, severe depression, much lowered self-esteem, humiliation, sleeplessness, physical weight gain and other emotional distress and compensatory damages in an amount according to proof. MARKGREN'S sudden, wrongful and humiliating termination has also adversely affected his disabilities including his heart condition, high blood pressure and severe depression.

98.     SAPUTO'S actions, as set forth above, were motivated by animus towards MARKGREN based on his disabilities and requests for reasonable accommodations while working.  Said acts were committed maliciously, fraudulently and oppressively, with the wrongful intention of injury MARKGREN, and with an improper and evil motive amounting to malice.  Said acts were carried out by managerial employees acting within the course and scope of their employment with SAPUTO and with the intent to injure MARKGREN.  MARKGREN is therefore entitled to recover compensatory and punitive damages commensurate with SAPUTO'S wealth, size and as set forth under 42 USC §1981a, 42 USC §12117(a).

99.     As a result of SAPUTO'S failure to reasonably accommodate MARKGREN'S disabilities as alleged herein and which violated the ADA, MARKGREN was damaged in an amount to be proven at trial, including, but not limited to, economic, compensatory, general and punitive damages, attorney fees and costs, according to proof.

WHEREFORE, MARKGREN requests relief as hereinafter provided.

## FIFTH CAUSE OF ACTION

### DISABILITY DISCRIMINATION
### In Violation of the Americans with Disability Act

### PLAINTIFF MARKGREN

### AGAINST DEFENDANT SAPUTO

100.    MARKGREN and STROHSCHEIN repeat and re-allege the allegations set forth in paragraphs 1 through 99, inclusive, of this Complaint.

101.    The ADA makes it an "unlawful employment practice" for an employer to discharge a person on the basis of his/her disability. 42 U.S.C. § 12112(a).  An employer discharges an employee because of his disability or when it fires the employee for conduct, which was caused by the disability.

102.    From 2012 forward, MARKGREN suffered from several disabilities while he was employed.  He had a serious heart condition since 2012 and went out for surgery in May 2012.  Two stents were placed in his heart.  He returned to work in approximately June 2012.  In July 2013, he fainted at work due to an extremely high working temperature of over 100 degrees Fahrenheit and was having chest pains.  He was transported via EMS from Saputo to the hospital.  He was diagnosed with coronary artery disease, congested heart failure, hypertension and severe depression.  He went out on short term disability/family leave.  In August 2013, his physician restricted him to working indoors at less than 100 degree Fahrenheit temperature.  From then forward, MARKGREN continued to have a serious heart condition which was exacerbated during the summers by working in a non-air-conditioned plant that regularly had temperatures exceeding 100 degrees Fahrenheit.  It was also exacerbated by the 2.5 years of harassment he endured from Selkow, Skow and Olson when they'd repeatedly remove his personal gear or tags.  He also continued to suffer from severe depression.

103.    In 2014, MARKGREN suffered a back strain and was diagnosed with sciatica causing him extreme pain while at work.  In December 2016, he underwent bariatric surgery and returned to work in early 2017.

104.     In July 2018, MARKGREN went to the emergency room complaining of dizziness, being clammy, sweaty and weak related to his heart.  He went out on a family leave in August 2018 to attend a specialized cardiac program.

105.     In mid-November 2018, MARKGREN underwent major back surgery for anterior and posterior lumbar fusion with decompression and laminectomy.  In December 2018, the doctors found an aortoiliac aneurysm.  He returned to work in approximately April-May 2019.

106.     At all times, MARKGREN provided the requested medical and leave information regarding his disabilities.  He also requested reasonable accommodations he needed at work.  It was also common knowledge with Human Resources, Safety and his management that he suffered from these disabilities.

107.     SAPUTO discriminated against MARKGREN when it terminated him in December 2019 without any warnings or counseling because of his disabilities related to his heart, his back and his severe depression.

108.     In December 2019, SAPUTO falsely accused MARKGREN of not following its lock-out tag-out procedures when emptying cheese from the tower of his machine yet Munson, MARKGREN'S supervisor, herself wrote that the "lock out tag out process for this part of the machine had not yet been decided so the belts were left on at the time to crumble up cheese in order to not plug up the star valve so it could run in order to keep the line running".  As such, MARKGREN did not violate SAPUTO'S safety protocols because none were in place.  As such, this alleged reason for terminating his employment days later was false.

109.     SAPUTO next discriminated against MARKGREN when it accused him of initiating a confrontation between himself and Selkow and Skow on December 28, 2019.  A review of the incident shows that Skow refused to help MARKGREN clean out the filler machine which violated SAPUTO policies; as MARKGREN was cleaning up the cheese on the floor, Selkow then turned off the first hose; when asked if he'd turned off the hose Selkow denied he did but the pliers needed to do so were in his pocket; during the discussion between MARKGREN and Selkow, Skow walked up and began yelling at MARKGREN, ordering him to go back to the other end of the floor.  MARKGREN turned and walked away.  He asked Munson

if he could leave because his anxiety level was increasing dramatically and he was fearful he'd suffer another heart attack at work.  The fact that MARKGREN had not been able to refill his depression medication also affected his reaction, increasing his panic levels.  Despite MARKGREN'S concerns for his heart and the lack of depression medication, SAPUTO terminated him for initiating the confrontation.  In doing so, SAPUTO ignored testimony that Selkow's and Skow's reactions were fake, MARKGREN had complained for over two years that Selkow and Skow had been harassing him, MARKGREN had turned and walked away from Skow and MARKGREN had not run into Skow as he was leaving.  As such, SAPUTO'S reasoning was false and facile and instead, terminated MARKGREN because of his disabilities.

110.     SAPUTO also discriminated against MARKGREN when SAPUTO replaced MARKGREN with individuals, who on information and belief, did not have a disability.

111.     SAPUTO engaged in a pattern and practice of discriminating against employees, including MARKGREN, on the basis of their protected categories, including their disabilities, in violation of the ADA by engaging in the course of conduct set forth above.

112.     As a proximate result of SAPUTO'S conduct, MARKGREN has suffered and will continue to suffer substantial losses incurred in earnings and other employment benefits he would have received had SAPUTO not taken such adverse employment action against him.

113.     Further, and as a proximate result of SAPUTO'S conduct, MARKGREN has suffered and will continue to suffer, emotional distress damages including anxiety, severe depression, humiliation, much lowered self-esteem, sleeplessness, weight gain and other emotional distress and compensatory damages in an amount according to proof.  MARKGREN'S sudden, wrongful and humiliating termination has also adversely affected his disabilities including his heart condition, high blood pressure and severe depression.

114.     SAPUTO'S actions, as set forth above, were motivated by animus towards MARKGREN based on his disabilities and requests for reasonable accommodations while working.  Said acts were committed maliciously, fraudulently and oppressively, with the wrongful intention of injury MARKGREN, and with an improper and evil motive amounting to malice.  Said acts were carried out by managerial employees acting within the course and scope

of their employment with SAPUTO and with the intent to injure MARKGREN.  MARKGREN

is therefore entitled to recover compensatory and punitive damages commensurate with

SAPUTO'S wealth, size and as set forth under 42 USC 1981a, 42 USC §12117(a).

115.    As a result of SAPUTO'S discriminatory acts as alleged herein, including

violation of the ADA, MARKGREN was damaged in an amount to be proven at trial, including,

but not limited to, economic, compensatory, general and punitive damages, attorney fees and

costs, according to proof.

WHEREFORE, MARKGREN requests relief as hereinafter provided.

<u>**SIXTH CAUSE OF ACTION**</u>

**RETALIATION IN VIOLATION OF FEDERAL
FAMILY AND MEDICAL LEAVE ACT
THE AMERICANS WITH DISABILITIES ACT and ADEA**

**PLAINTIFF MARKGREN**

**AGAINST DEFENDANT SAPUTO**

116.    MARKGREN and STROHSCHEIN repeat and re-allege the allegations set forth

in paragraphs 1 through 115, inclusive, of this Complaint.

117.    At all times herein mentioned, the Family and Medical Leave Act, 29 USC §2601

*et seq.*, was in full force and effect and binding on SAPUTO.  The FMLA requires SAPUTO to

grant employees with a serious medical condition up to twelve weeks of leave.  An employee is

entitled to reinstatement to his/her former job at the end of any FMLA leave.  Indeed, an

employee is guaranteed the right to reinstatement to "the same or comparable position" or to an

"equivalent position".  An employer is also prohibited from retaliating against an employee who

has taken time off for serious medical conditions.

118.    The ADA also prohibits an employer from retaliating against an employee who

requests reasonable accommodations on the job.

119.    The ADEA prohibits retaliation when an employee complains of harassment in

the workplace based upon their age.

/ / /

120.     MARKGREN'S serious medical conditions and disabilities began in 2012 when he suffered a heart attack and went out on a medical leave of absence.  He underwent heart surgery and two stents were placed in his heart.  In 2013, he went to the emergency room via EMA and was diagnosed with coronary artery disease, congested heart failure, hypertension and depression.  He was given a work restriction of not working inside if the temperature exceeded 100 degrees Fahrenheit. He requested accommodations but none were given.  In 2016, because of his sciatica, his physician limited him to working 6 hours/day.  In March 2016, his physician pulled him off work.  In July 2018, he against went to the emergency room with complaints of dizziness, being clammy, sweaty and weak.  He went on a family medical leave starting in approximately August 2018 to attend a specialized cardiac program for two months.  In November 2018, he went out on family leave to undergo back surgery for anterior and posterior lumbar fusion.  In December 2018, the doctors found an aortoiliac aneurysm. He returned to work in approximately April-May 2019.

121.     Several times from 2012 forward, MARKGREN requested reasonable accommodations on the job.  The most recent were in 2017 and then again in 2019 after he returned to work.  In 2017, he requested a transfer to the new air-conditioned plant also in Almena and asked for accommodations on his PPG equipment.  In approximately Spring 2018 and then again when he returned from family leave in early 2019, MARKGREN asked Bertelsen to change the CIP pan under the tower which was part of the system to wash out the tower.  It was one large heavy pan which was difficult for any person to maneuver by themselves.  It was especially difficult for MARKGREN with his back disability and sciatica. Bertelsen never changed the pan so MARKGREN went to the Plant Manager, Compean in 2019.  Within two weeks the one single pan was replaced with two lighter pans which worked quite well.  Given the ease with which the pans were changed, MARKGREN did not understand why Bertelsen had not changed the pans prior to his surgery.

122.     At all times, MARKGREN informed SAPUTO, including Human Resources, his supervisors and managers, of his serious medical conditions, disabilities and family and medical leaves of absences.  He consistently provided the medical forms requested by SAPUTO.

123.    For the last two and a half years of his employment, MARKGREN complained to Munson, his supervisor, that he was being harassed by Selkow, Skow and Olson when his PPG and lock-out-tag-out tags were missing or when he found hangers in his locker.  He would do so once a week or twice each month on the average.  He also told Munson that the continued harassment was adversely affecting his health, increasing his anxiety and threatening his heart.  SAPUTO did nothing.

124.    In 2019, new management was employed at the Almena plants including Miller as the Plant Manager and Schurman, Housner and Ellefson in Human Resources.  Shortly after he returned to work and after Miller became the Plant Manager, SAPUTO used the events of December 23, 2019 and December 28, 2019 to retaliate against MARKGREN for taking his family and medical leaves, asking for reasonable accommodations at work and complaining of harassment.  In retaliation for these requests, SAPUTO terminated MARKGREN in late December 2019 for false reasons.  Indeed, SAPUTO accused MARKGREN of violating lock out tag out procedures which in fact, did not exist.  They then accused MARKGREN of initiating a confrontation between himself and Selkow and Skow ignoring Selkow's and Skow's continual harassment from MARKGREN for the previous two years and witnesses who corroborated MARKGREN'S version of what happened that day.

125.    On information and belief, MARKGREN believes that other employees, including those with disabilities, who requested reasonable accommodations on the job and/or who took time off for family and medical leaves and/or who complained of harassment in the workplace, have also been retaliated against especially by the new management at Saputo.

126.    As a result of these actions against him, MARKGREN has suffered not only the loss of his employment, including wages and benefits, but also has suffered severe emotional and physical distress.

127.    SAPUTO'S actions were motivated by animus toward MARKGREN based on his disabilities, need for family and medical leaves of absence and requests for reasonable accommodations and complaints of harassment based on his age.  Said acts were committed maliciously, fraudulently and oppressively, with the wrongful intent of injuring MARKGREN

and with an improper and evil motive amounting to malice.  SAPUTO'S acts of intentionally retaliating against MARKGREN were carried out by managerial employees acting within the course and scope of their employment with SAPUTO.  MARKGREN is therefore entitled to punitive damages pursuant to statute.

128.     As a result of SAPUTO'S malicious acts of retaliation as alleged herein, MARKGREN was damaged in an amount to be proven at trial, including, but not limited to, compensatory, general and punitive damages, attorneys' fees and costs according to proof.

WHEREFORE, MARKGREN requests relief as hereinafter provided.

<u>**SEVENTH CAUSE OF ACTION**</u>

**NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

**PLAINTIFFS MARKGREN AND STROHSCHEIN**

**AGAINST ALL DEFENDANT SAPUTO**

129.     MARKGREN and STROHSCHEIN repeat and re-allege the allegation set forth in paragraph 1 through 128, inclusive, of this Complaint.

130.     Negligent Infliction of Emotional Distress is severe emotional distress that is proximately caused by the defendant's negligent conduct or willful violation of a statutory standard. Federal law mandates that an employer take the necessary action that is reasonably calculated to end illegal and inappropriate conduct creating a discriminatory and hostile work environment for one or more of its employees.  An employer is thereby liable for the injury caused to an employee by its failure, whether willful or negligent, to eradicate the illegal conduct of another of its employees, managers or agents that is causing another foreseeable harm.

131.     SAPUTO'S conduct, as set forth above, whether negligent or otherwise, caused MARKGREN and STROHSCHEIN severe emotional distress when they discriminated against them because of their age and because of their gender.  Indeed, SAPUTO knew or reasonably should have known that their sudden termination of MARKGREN and STROHSCHEIN, including for false reasons, would cause each emotional distress.  As such, SAPUTO'S actions violated known public policy as set forth in Title VII and the ADEA.

132.   SAPUTO'S conduct towards MARKGREN, in terminating him after he'd (i) taken a family and medical leave for a serious health condition/disability, (ii) requested reasonable accommodations on the job and (iii) complained of harassment in the workplace by younger employees, was similarly violative of public policy including the FMLA, the ADA and the ADEA.  Thus, SAPUTO knew or reasonably should have known that their retaliation and sudden termination of MARKGREN would cause him emotional distress.

133.   As a proximate result of SAPUTO'S conduct, MARKGREN and STROHSCHEIN have suffered, and will continue to suffer damages including substantial losses in earnings and other employment benefits each would have received had SAPUTO not wrongfully and discriminatorily terminated their employment.

134.   MARKGREN and STROHSCHEIN also suffered and continue to suffer emotional distress including but not limited to anxiety, worry about earnings and insurance, sleeplessness, clenching of teeth, low self-esteem, depression and increased anxiety and concern by MARKGREN for his heart, high blood pressure and depression, all to their damage in an amount according to proof.

135.   SAPUTO, and each of them, did the acts alleged herein maliciously, fraudulently and oppressively, with the wrongful intent to injure MARKGREN and STROHSCHEIN, from an improper and evil motive amounting to malice and in conscious disregard of MARKGREN's and STROHSCHEIN'S rights.  The acts complained of were known to, authorized and ratified by SAPUTO.  MARKGREN and STROHSCHEIN are therefore entitled to recover punitive damages from SAPUTO, and each of them, in an amount according to proof.

WHEREFORE, MARKGREN and STROHSCHEIN request relief as hereinafter provided.

## EIGHTH CAUSE OF ACTION

### NEGLIGENT HIRING AND RETENTION

### PLAINTIFFS MARKGREN AND STROHSCHEIN

### AGAINST DEFENDANT SAPUTO

136.   MARKGREN and STROHSCHEIN repeat and re-allege the allegation set forth in paragraphs 1 through 135, inclusive, of this Complaint.

137.    SAPUTO had a duty and an obligation under Title VII, the ADA, the ADEA and the FMLA to prevent and to protect its employees from discrimination, retaliation and harassment in the workplace.  This duty is imposed for the specific protection of its employees. Here, SAPUTO'S duty was heightened because it knew MARKGREN was protected under all of these laws and that STROHSCHEIN was protected under Title VII and the ADEA.  More importantly, the very individuals hired to protect employees in the workplace, Human Resources, plus the newly hired Plant Manager, were the individuals who decided to wrongfully terminate both MARKGREN and STROHSCHEIN based upon their protected statuses and for reasons that were false.  Thus, they themselves knew that they were discriminating and retaliating against both plaintiffs in the workplace.  To prevent said discrimination and harassment, SAPUTO had a duty to hire, train and supervise management personnel, including in Human Resources and the Plant Manager, in such a manner so that the type of tortious conduct as herein alleged would not occur.

138.    SAPUTO breached its duty to protect its employees, primarily MARKGREN and STROHSCHEIN, from being discriminated and retaliated against and harassed in the workplace on the basis of their age and gender and MARKGREN because of his disabilities and family leaves, by repeatedly failing to properly hire, train and supervise its management employees. Although readily able to do so, SAPUTO willfully and recklessly failed to adequately hire professional managers or supervisors to work with its employees including MARKGREN and STROHSCHEIN. Instead, SAPUTO repeatedly hired either younger and/or inexperienced supervisors and managers including Miller, Featherly, Munson, Bertelson, Schurman, Ellefson and Housner, or did not train them regarding protections afforded to employees in the workplace.

139.    Here, MARKGREN'S own supervisor, Munson, knew of the harassment he was subjected to on a regular basis for almost two years.  Yet, she never stopped the harassment or disciplined the harassers.  Management, including Human Resources, Munson and Bertelson, failed to reasonably accommodate MARKGREN'S disabilities and completely shut him down when he asked for a transfer, proper ventilation or a change in pans.  Finally, SAPUTO failed to investigate the allegations against both MARKGREN and STROHSCHEIN and instead, ratified

their wrongful terminations based on false accusations.  SAPUTO could have but chose not to prevent the wrongful terminations of two very long-term employees based upon their protected categories of age, being white and male, among others

140.   SAPUTO also breached its duty to MARKGREN and STROHSCHEIN as employees by negligently and willfully failing to monitor much less discipline Schurman, Ellefson, Housner, Featherly and/or Miller.  Instead, SAPUTO ratified their discrimination of MARKGREN and STROHSCHEIN when they terminated them in 2019 and 2020 respectively. They further ratified the discrimination when they awarded MARKGREN'S and STROHSCHEIN'S positions to younger, less experienced individuals, one of whom was female. Indeed, these younger supervisors and managers proximately caused and allowed this harassment, retaliation and discrimination of MARKGREN and STROHSCHEIN to continue.

141.   As a proximate result of SAPUTO'S conduct, MARKGREN and STROHSCHEIN have suffered, and will continue to suffer damages including substantial losses in earnings and other employment benefits each would have received had SAPUTO not discriminatorily terminated their employment.  Further, MARKGREN and STROHSCHEIN have suffered and continue to suffer emotional distress all to their damage in an amount according to proof.  The emotional distress has also adversely affected MARKGREN'S disabilities including his heart condition, high blood pressure and depression.

142.   SAPUTO, and each of them, did the acts alleged herein maliciously, fraudulently and oppressively, with the wrongful intent to injure MARKGREN and STROHSCHEIN, from an improper and evil motive amounting to malice and in conscious disregard of MARKGREN'S and STROHSCHEIN'S rights under Title VII, the ADEA, the ADA and the FMLA.  The acts complained of were known to, authorized and ratified by SAPUTO.  MARKGREN and STROHSCHEIN are therefore entitled to recover punitive damages from SAPUTO, and each of them, in an amount according to proof.

WHEREFORE, MARKGREN and STROHSCHEIN request relief as hereinafter provided.

/ / /

Complaint for Damages Based On Age Discrimination,    Reverse Gender Discrimination etc.

40

## NINTH CAUSE OF ACTION

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

## PLAINTIFF PETER MARKGREN

## AGAINST DEFENDANT SAPUTO

143.    MARKGREN and STROHSCHEIN repeat and re-allege the allegations set forth in paragraphs 1 through 142, inclusive, of this Complaint.

144.    Intentional infliction of emotional distress is extreme and outrageous conduct that intentionally or recklessly causes another severe emotional distress.  SAPUTO, including its managers and supervisors, openly displayed hostility towards MARKGREN and STROHSCHEIN based upon their age and gender.  SAPUTO intentionally allowed the three younger male operators to harass MARKGREN during the last 2.5 years of employment when they took his personal protective gear or lock out tags and when they stuffed his locker with hangers.  Each time it happened, MARKGREN reported it to Munson who though she promised to resolve it, never did.  Human Resources never got involved even after MARKGREN told Munson that the continued harassment was increasingly bothering him, was causing him anxiety and he was beginning to worry about his health, including among other things, his heart, when he came to work.  MARKGREN often relayed that he was finding it difficult to come to work.  Yet, Munson stood by and did nothing.  The harassment peaked on December 28, 2019 when Skow refused to help MARKGREN remove cheese from his machine, Selkow turned off the hose MARKGREN had turned on to clean up the cheese and then denied it, and Skow began to yell at MARKGREN ordering him to go back to the other end of the floor.  MARKGREN, shaking and trembling and beginning to panic, did as Skow demanded.  He then called Munson telling her he had to leave immediately as he was concerned he'd have another heart attack.  SAPUTO then terminated MARKGREN for false reasons yet supported the younger employees, Selkow, Skow and Olson, by allowing them to file false complaints against MARKGREN and harass him.  SAPUTO'S treatment of MARKGREN violated several federal statutes and has caused MARKGREN, after over 30 years of dedicated employment, severe emotional distress.

145.    SAPUTO also intentionally caused MARKGREN severe emotional distress when he asked on several occasions for reasonable accommodations such as increased ventilation in his work area, a transfer to the new air-conditioned plant and changing out a heavy pan.  Instead of discussing these with MARKGREN, the requests were shot down immediately including by Human Resources and Safety employees.  His supervisor, knowing the adverse effect the work environment was having on MARKGREN, also failed to follow up to determine whether or not any reasonable accommodations were available for MARKGREN.  This meant that MARKGREN was forced to work in extreme temperatures in an often-hot plant, especially in summers, in direct violation of his physician's orders.  MARKGREN was under extreme pressure to report to work though he was always worried about having another heart attack at work.

146.    By knowingly and willfully allowing the continuing harassment, discrimination and retaliation of MARKGREN based on his age, disabilities, requests for accommodations, use of family and medical leave and gender by his younger male co-workers and supervisors and managers, SAPUTO'S conduct, as set forth above, was extreme and outrageous, beyond all bounds of decency and an abuse of the authority and position of SAPUTO and each of them. SAPUTO'S conduct of intentionally violated several statutory employment laws, was intended to and did proximately cause MARKGREN to suffer severe emotional distress.   Alternatively, said conduct was done in conscious disregard of the probability of causing such distress.  Indeed, SAPUTO'S conduct caused MARKGREN injuries beyond those normally risked in one's employment or normally expected to occur in the workplace.  As such, SAPUTO abused its position of authority toward MARKGREN and allowed conduct to continue which only humiliated and deeply upset her.

147.    As a proximate result of SAPUTO'S conduct, MARKGREN has suffered, and will continue to suffer damages including substantial losses in earnings and other employment benefits he would have received had SAPUTO not wrongfully harassed, discriminated against and retaliated against him ultimately terminating his employment.   MARKGREN has suffered and continues to suffer emotional distress which has manifested itself physically especially

relating to his heart, blood pressure, weight and depression, all to his damage in an amount according to proof.

148.   SAPUTO, and each of them, did the acts alleged herein maliciously, fraudulently and oppressively, with the wrongful intent to injure MARKGREN, from an improper and evil motive amounting to malice and in conscious disregard of MARKGREN's rights.  The acts complained of were known to, authorized and ratified by SAPUTO.  MARKGREN is therefore entitled to recover punitive damages from SAPUTO, and each of them, in an amount according to proof.

WHEREFORE, MARKGREN requests relief as hereinafter provided.

## TENTH CAUSE OF ACTION

### WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY

### PLAINTIFFS MARKGREN and STROHSCHEIN

### AGAINST DEFENDANT SAPUTO

149.   MARKGREN and STROHSCHEIN repeat and re-allege the allegations set forth in paragraph 1 through 148, inclusive, of this Complaint.

150.   SAPUTO allowed MARKGREN to be harassed for the final 2.5 years of employment after over 30 years of exemplary performance and service to the company.  The harassment culminated in the events of December 28, 2019 when MARKGREN was confronted by Selkow and Skow, both of whom harassed, berated, yelled at and lied to MARKGREN. Instead of disciplining Selkow and Skow, SAPUTO disciplined and terminated MARKGREN. MARKGREN believes he was terminated because of his age, 55; because he was male; because he had disabilities and requested reasonable accommodations for several years and because he'd taken family and medical leaves to deal with his serious medical conditions and disabilities. SAPUTO'S actions violated public policy under Title VII, the ADEA, the ADA and FMLA which protect employees in the workplace from discrimination, retaliation and harassment because of their age, gender, disabilities and family leaves of absence.

151.   SAPUTO also violated public policy under Title VII and the ADEA when it wrongfully terminated STROHSCHEIN for false reasons; failed to investigate the allegations

Complaint for Damages Based On Age Discrimination,    Reverse Gender Discrimination etc.

43

against STROHSCHEIN after Miller became the Plant Manager especially in November 2019 and early March 2020; promoted a much younger new hire into his position and failed to discipline much less terminate another female supervisor though she also violated management instructions and protocols.  Thus, SAPUTO violated public policy by discriminating against STROHSCHEIN based on his age and in reverse, based on his gender.

152.     As a proximate result of SAPUTO'S conduct, MARKGREN and STROHSCHEIN have suffered and will continue to suffer substantial losses incurred in earnings and other employment benefits each would have received had SAPUTO not wrongfully terminated their employment.

153.     Further, and as a proximate result of SAPUTO'S conduct, MARKGREN and STROHSCHEIN have suffered, and will continue to suffer, emotional distress damages including anxiety, depression, humiliation, anger, sleeplessness, weight gain and other emotional distress in an amount according to proof.  The emotional distress has also exacerbated MARKGREN'S disabilities of coronary heart disease, depression and high blood pressure.

154.     SAPUTO'S actions, as set forth above, were motivated by animus towards MARKGREN because of his age, gender, disabilities and time off for family leave.  SAPUTO'S actions, as set forth above, were motivated by animus towards STROHSCHEIN because of his age and gender, male.  Said acts were committed maliciously, fraudulently and oppressively, with the wrongful intention of injuring MARKGREN and STROHSCHEIN, and with an improper and evil motive amounting to malice.  Said acts were carried out by managerial employees acting within the course and scope of their employment with SAPUTO and with the intent to injure MARKGREN and STROHSCHEIN.  They are each then entitled to recover compensatory and punitive damages commensurate with SAPUTO'S wealth.

155.     As a result of SAPUTO'S discriminatory acts as alleged herein, including violation of Title VII, the ADEA, the ADA, and the FMLA, MARKGREN and STROHSCHEIN were damaged in an amount to be proven at trial, including, but not limited to, compensatory, general and punitive damages and attorneys' fees, according to proof and as provided by the respective state and federal statutes.

WHEREFORE, MARKGREN and STROHSCHEIN request relief as hereinafter provided.

## **PRAYER FOR RELIEF**

WHEREFORE, plaintiffs pray for judgment against defendants as follows:

1.      For all actual, consequential, and incidental losses, including, but not limited to the loss of income and benefits, including back pay and front pay, according to proof, together with prejudgment for all causes of action;

2.      For general, compensatory and non-economic damages for the third through tenth causes of action;

3.      For liquidated damages for the first and second causes of action;

4.      For exemplary and punitive damages for the third through tenth causes of action;

5.      For costs of suit herein, including reasonable attorneys' fees;

6.      For prejudgment interest at the prevailing legal rate; and

7.      For such other and further relief as the Court may deem proper.

DATED:  July 2, 2021                    THE HUBER LAW FIRM


By:      _____
            BETH A. HUBER
            Attorneys For PLAINTIFFS PETER MARKGREN
            And DARYL STROHSCHEIN


## **JURY DEMAND**

Plaintiff demands trial by jury in this action

DATED:  July 2, 2021                    THE HUBER LAW FIRM


By:      _____
            BETH A. HUBER
            Attorneys For
            PLAINTIFFS PETER MARKGREN and
            DARYL STROHSCHEIN

Complaint for Damages Based On Age Discrimination,    Reverse Gender Discrimination etc.

45