IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

PETER MARKGREN,

                              Plaintiff,                         OPINION and ORDER

   v.

SAPUTO CHEESE USA, INC.,                                        21-cv-429-jdp

                              Defendant.

---

Plaintiff Peter Markgren had worked for defendant Saputo Cheese USA, Inc. for more than 30 years when Saputo terminated his employment in 2019. Saputo says that it fired Markgren because he violated two work safety rules. But Markgren contends that Saputo discriminated against him based on his age, disability, and sex; failed to accommodate his disability; subjected him to a hostile work environment because of his age; and retaliated against him for reporting the harassment and requesting disability accommodations.

Saputo moves for summary judgment. Dkt. 54. The court will deny the motion on Markgren's failure-to-accommodate claim under the Americans with Disabilities Act. Markgren has adduced evidence that despite extraordinary heat in the workplace, Saputo failed to consider a reasonable accommodation for his disability, a heart condition. The court will grant summary judgment to Saputo on the rest of Markgren's claims. Saputo had legitimate reasons for Markgren's termination: he violated a company safety protocol and a rule against using physical violence at work. Markgren has not adduced evidence sufficient to support a reasonable jury finding that either of these reasons were a pretext for discrimination or retaliatory. Markgen was harassed by his coworkers, but he has not adduced evidence that the

harassment was based on his age. The court will also grant Saputo's motion for a protective order, Dkt. 108, and deny Markgren's motion to compel, Dkt. 114.

PROBLEMS WITH PLAINTIFF'S SUMMARY JUDGMENT SUBMISSIONS

The court begins with the many problems with Markgren's summary judgment materials. Markgren submitted lengthy factual finding materials, disputing the vast majority of Saputo's 135 proposed facts and proposing an additional 355 facts of his own. Dkt. 84 and Dkt. 86.

Both documents fail to comply with the court's summary judgment procedures. Dkt. 21, at 2. Markgren disregards the court's rule that a party must respond to proposed facts with directly responsive facts, not additional and unnecessary ones.[1] Many of Markgren's responses also raise clearly immaterial factual disputes,[2] do not clearly state whether each fact is disputed or undisputed,[3] contain factual and legal arguments,[4] and object to the admissibility of Saputo's evidence on an array of grounds with vague and conclusory arguments.[5] Yet, in

---

[1] *See e.g.,* Markgren's Response to Saputo's Proposed Findings of Fact, Dkt. 84, at ¶¶ 4, 9, 12.

[2] *See e.g., id.,* at ¶ 9 (disputing proposed fact that Margkren was over 40 years old when terminated on grounds that he was 55 years old when terminated); ¶ 54 (disputing verbatim and accurate quote from Markgren's own testimony on grounds that it misrepresented Markgren's testimony).

[3] *See e.g., id.,* at ¶¶ 1, 26.

[4] *See e.g., id.,* at ¶¶ 10, 12, 13

[5] *See, e.g., id.* at ¶ 16, 18, 20.

some cases, Markgren cited that same purportedly inadmissible evidence to support his own proposed findings of fact.[6]

Markgren's own proposed facts also violate the procedures. Dkt. 86. The facts restate and dispute Saputo's proposed facts rather than supplement them,[7] contain compound facts,[8] make arguments on the merits,[9] and cite to Markgren's own exhibit labels and Bates numbers rather than to the court's docket numbers.[10]

The purpose of the court's summary judgment procedures is to allow the court to identify disputed and undisputed material facts. But Markgren's materials simply treat the proposed findings of fact as another opportunity to argue his case, which has created unnecessary repetition and length, and has frustrated the court's efforts to efficiently decide this motion. In deciding this motion, the court has disregarded Markgren's proposed facts or responses to Saputo's proposed facts that contain unnecessary, redundant, or unresponsive facts; that are argumentative and conclusory; and that challenge the admissibility of evidence that Markgren relied on elsewhere to support his own case.

The court has previously warned Markgren's counsel about her failure to follow the court's summary judgment procedures. *Collins v. Energizer Holdings, Inc.*, No. 21-CV-390-JDP, 2022 WL 17155848, at *1–2 (W.D. Wis. Nov. 22, 2022). In future cases, if counsel submits

---

[6] *See, e.g.,* Dkt. 102, ¶ 62 (contending that near miss report is inadmissible hearsay) and Dkt. 103, ¶ 137 (relying on same near miss report to support his own proposed fact).

[7] *See e.g.*, Markgren's Proposed Findings of Fact, Dkt. 86, ¶¶ 2, 5, 6.

[8] *See e.g. id*. at ¶ 3, 13, 20

[9] *See e.g. id*. at ¶ 150, 151, 152

[10] *See, e.g. id*. at ¶ 1, 2, 3

responses to proposed facts that present similarly unresponsive and clearly meritless disputes, the court will disregard the responses and deem the opposing party's proposed facts undisputed. If counsel submits additional proposed facts that merely restate the opposing party's facts, or simply substitute those facts, or are otherwise excessive or redundant, the court will disregard the entire filing.

UNDISPUTED FACTS

The following facts are undisputed unless otherwise noted.

**A.  Markgren's employment at Saputo**

Peter Markgren began working at a cheese production plant in Almena, Wisconsin, in 1987. At the time, the plant was owned by Twin Town Cheese Factory; the plant was later purchased by Saputo, a large-scale cheese producer with facilities throughout Wisconsin. Saputo opened a second cheese production plant in Almena in 2017.

At the time of the incidents in question, Markgren was 55 years old. He had been employed at Saputo's older Almena plant for 32 years, working as a rotary press operator for 18 years in the plant's lower make room.

**B.  Markgren's health and leaves of absence**

In 2012, Markgren began to develop serious heart problems, including coronary artery disease, congestive heart failure, and hypertension. Between 2012 and 2019, Markgren took medical leave related to his heart problems and other medical issues numerous times. For example, he had a heart attack in 2012, underwent heart surgery, and took approximately three-weeks of medical leave to recover. In early 2013, Markgren had a second heart surgery and took another eight weeks off work.

4

In July 2013, a few months after he had returned to work from his heart surgery, Markgren fainted at work. The lower make room had reached 105 degrees, causing Markgren to lose consciousness. He was taken to the emergency room and admitted to the hospital. His provider cleared him to return to work on August 5 with a restriction to working in temperatures of less than 100 degrees.

In July 2018, Markgren was at work when he began to feel dizzy and weak. He was taken to the emergency room and was diagnosed with heat exhaustion; the plant had reached 102 to 107 degrees. Markgren had also been experiencing chronic back pain for several years. In November 2018, he underwent back surgery and returned to work in April 2019.

## C.  Heat restriction accommodations

Markgren's medical restriction to work in temperatures under 100 degrees, first given to him in 2013, remained in place for the remainder of his employment at Saputo. The plant regularly reached or exceeded 100 degrees, especially during the summer.

Beginning in 2013, Markgren raised the issue of high temperatures in the plant and proposed several ways to control his exposure to heat. He asked Saputo to repair a broken air conditioning unit several times. He also requested a larger exhaust fan to improve air circulation in the lower make room. Saputo did not change the ventilation in the plant.

In 2017, when Saputo opened its new plant in Almena, Markgren asked to be transferred there because it was air conditioned. Saputo told him that he could transfer but that his hourly wage would be two dollars less per hour. Markgren declined the transfer. He says that he could not afford the pay cut.

Saputo began requiring employees to wear more robust personal protective gear when cleaning the plant in 2017. Markgren says that the new gear was heavy and unbreathable. He

asked Saputo if he could wear the lighter gear that he previously wore to avoid overheating and triggering his heart condition. Saputo said that he was required to wear the new gear but that he could take additional breaks if the new personal protective gear made him too hot.

### D.  Harassment from 2017 to 2019

Markgren contends that three of his coworkers at the plant, Dylan Skow, Anthony Selkow, and Matt Olson began harassing him in 2017. Specifically, once or twice per week, they took Markgren's personal protective gear and his lockout-tagout cards, which are used when cleaning and disassembling machines. Each time Markgren's property went missing, he had to spend time looking for it or obtaining new gear and tags from his supervisor. Skow, Selkow, and Olson also stuffed hangers in Markgren's locker twice in November 2019.

Markgren reported the missing property and the hangers in his locker numerous times to his supervisor, Shann Munson. Munson told Markgren that she would investigate and address the issue. At staff meetings, Munson sometimes told employees that they should not interfere with each other's property. After these announcements, his coworkers' conduct improved, but only temporarily.

In November 2019, Markgren told Munson that the problem was getting worse and that it was adversely affecting his health by making him anxious and nervous when he arrived at work. Skow, Selkow, and Olson were not disciplined for their conduct.

### E.  December 23, 2019 "lockout-tagout" incident

On December 23, 2019, Markgren was working in the lower make room when two parts of his machine plugged with cheese—the augers and the tower, which is located above the augers. Saputo employees are required to follow a "lockout-tagout" procedure when servicing or performing maintenance on a machine. The employee must shut off power and "lock out"

6

of the machine using a tag. This prevents the machine from unexpectedly starting while it is being worked on. To clean the augers, Markgren powered off the machine, locked out of it, and cleared cheese. Then, he cleaned the tower, but he didn't power down or lock out of the machine for that part of the work.

Two days later, Saputo employee Megyn Kelsch submitted a "near miss" report stating that Markgren failed to follow the proper lockout-tagout procedures when cleaning the machine's tower and another component of the machine called the star valve. In response to the report, Shann Munson investigated the incident with health and safety specialist Tammy Bertelsen and another manager. They concluded that Markgren should have followed the lockout-tagout policy when cleaning the tower. After they shared their findings via email with plant manager David Miller, human resources manager Julia Fossum, and human resources generalist Jennifer Ellefson, Fossum recommended that Markgren receive additional training and a written warning.

### F.  December 28, 2019, physical contact incident

A few days later, on December 28, 2019, at the beginning of Markgren's shift, one of the augers on his machine again plugged with cheese. He cleaned it out, causing some cheese to fall onto the floor. He turned on a hose under his machine and walked to the other side of the machine to turn on a second hose. When he returned, the first hose had been turned off.

He noticed that Selkow had a pair of pliers in his pocket, which were needed to turn off the hose. He asked Selkow if he had shut the water off. Selkow first denied turning off the hose, but later in the conversation admitted that he had. Markgren and Selkow began arguing, and Skow got involved. By the end of the exchange, all three were yelling at each other.

Markgren walked away from the argument and heard Skow and Selkow laughing at him. Markgren was upset and called Munson, who came down to the lower make room. Markgren asked for the rest of the day off because he was extremely angry and worried about his heart condition. Munson agreed to let him go home. The parties dispute what happened as Markgren left the room. According to Saputo, Markgren intentionally bumped into Skow on the way out. Markgren denies this. He says that he did not make physical contact with Skow, but that if he did, it was either unintentional, or it was Skow who backed into Markgren.

Munson conducted an initial investigation into the incident by talking to Markgren, Skow, and Selkow. She shared her findings with Fossum and Ellefson. Fossum called Markgren to discuss what had happened. Later that day, Fossum left for vacation, and Ellefson took over the investigation. Ellefson spoke with Selkow and Skow. After the investigation was complete, Ellefson met with Miller and regional human resources manager Lisa Housner and told them that Markgren was at fault in the incident. Miller decided that Markgren should be terminated, and Saputo fired Markgren on December 31.

The court will discuss additional facts as they are relevant to the analysis.

ANALYSIS

Markgren asserts several claims against Saputo. He contends that Saputo: (1) wrongfully terminated him on the basis of disability, age, and sex in violation of the Americans with Disabilities Act (ADA), Age Discrimination in Employment Act (ADEA), and Title VII;  (2)  subjected him to a hostile work environment because of his age in violation of the ADEA; (3) retaliated against him on the basis of his disability and age under the ADA,

ADEA, and Family Medical Leave Act (FMLA); and (4) failed to accommodate his disability under the ADA.

Saputo is entitled to summary judgment if it shows that there are no genuine issues of material fact and is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court views the evidence in the light most favorable to Markgren and draws all reasonable inferences in his favor. *Miller v. American Family Mutual Ins.*, 203 F.3d 997, 1003 (7th Cir. 2000). But in response to Saputo's motion, Markgren bears the burden of identifying evidence that would allow a reasonable jury to find in his favor on his claims. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

### A.  Wrongful termination claims

Markgren's core contention is that Saputo wrongfully terminated him because of his age, disability, and sex. To prevail on his wrongful termination claims based on age and disability, Markgren must show that he would not have been fired "but for" having these characteristics. *Marnocha v. St. Vincent Hosp.* & *Health Care Ctr., Inc.*, 986 F.3d 711, 718 (7th Cir. 2021) (ADEA); *Brooks v. Avancez*, 39 F.4th 424, 440 n.11 (7th Cir. 2022) (ADA). To establish his sex discrimination claim, the causation standard is lower, and only requires Markgren to show that his sex was a "motivating factor" in his termination. *Kluge v. Brownsburg Cmty. Sch. Corp.*, 64 F.4th 861, 882 (7th Cir. 2023). The court concludes that Markgren cannot prevail under either standard, so it will discuss Markgren's age, disability, and sex discrimination claims together.

The core question in any discrimination case is whether a reasonable jury could find that the defendant treated the plaintiff adversely because of a protected characteristic, in this case, Markgren's age, disability, or sex. *See Lewis v. Indiana Wesleyan University*, 36 F.4th 755,

760 (7th Cir. 2022). The parties rely on the burden-shifting framework introduced in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). Under that framework, the plaintiff must present evidence on the elements of a prima facie case, which vary slightly depending on the type of claim the plaintiff is asserting. *Lewis*, 36 F.4th at 759–60. The burden then shifts to the employer to present evidence on its reason for taking the adverse action. *Id*. Finally, the plaintiff must show that the employer's reason is a pretext for discrimination. *Id.*

The *McDonnell Douglas* framework can be an efficient way to organize, present, and assess evidence in discrimination cases. *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018). But the Seventh Circuit has encouraged district courts to focus on the central issue, which is whether the evidence as a whole would permit a reasonable jury to conclude that the plaintiff's age, sex, or other protected trait caused the employer's adverse action. *Monroe v. Ind. Dep't of Transp.*, 871 F.3d 495, 504–05 (7th Cir. 2017).

Saputo offers two reasons for terminating Markgren: he violated a company safety procedure called lockout-tagout and a policy prohibiting physical violence. Markgren attacks the legitimacy of both violations. He says that the safety policy was not applicable to his conduct, that he did not push Skow, and that Saputo's investigations into the incidents were biased. Markgren also offers other evidence that these violations were pretext: Saputo did not fire similarly situated employees with commensurate disciplinary histories, treated younger, female, and able-bodied employees more favorably than Markgren, and discriminated against other older employees.

The court will consider Saputo's proffered reasons for its actions and assess Markgren's evidence that those reasons are a pretext for discrimination. *Monroe,* 871 F.3d at 504–05. But the court does not act as a "super-personnel department with authority to review an employer's

business decision as to whether someone should be fired or disciplined because of a work-rule violation." *See Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 697 (7th Cir. 2006). The question is not whether the employer's termination decision was accurate or fair. *Coleman v. Donahoe*, 667 F.3d 835, 852 (7th Cir. 2012). All that matters is whether the employer honestly believed the stated reasons it offered for the termination. *Id.*

So, to avoid summary judgment, Markgren must show that Saputo's given reasons were not the true reasons for his termination. *Arrigo v. Link*, 836 F.3d 787, 796 (7th Cir. 2016). To meet this burden, he must "identify such weaknesses, implausibilities, inconsistencies, or contradictions" in Saputo's asserted reasons "that a reasonable person could find [them] unworthy of credence" and infer that they did not actually prompt the termination. *Coleman*, 667 F.3d at 852 (citing *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 792 (7th Cir. 2007)).

### 1. December 23, 2019, "lockout-tagout" incident

Markgren contends that the lockout-tagout violation was pretextual because he did not actually violate the policy. It is undisputed that on December 23, 2019, the augers and the tower of Markgren's machine plugged with cheese. He followed the lockout-tagout procedure when cleaning out the augers, but he did not follow those procedures with the tower. Markgren contends that the lockout-tagout instructions did not apply to the tower at the time of the incident.

The question for this case is not whether Saputo correctly determined that Markgren committed the violation. What matters is whether Saputo honestly believed that he engaged in misconduct.

The evidence cited by both parties demonstrates that several Saputo employees who investigated the incident concluded that even if the lockout-tagout instructions were not clear,

Markgren should have known that his actions posed a safety risk. After receiving the near miss report, Munson investigated the incident with Bertelsen and another manager. They concluded that Markgren should have used lockout-tagout because the tower was close enough to other components of the machine to pose a safety hazard. Dkt. 88-4. Bertelsen sent a summary of the investigation findings to Miller, Fossum, and Ellefson later that day. Dkt. 88-10. Bertelsen noted that Markgren had missed some lockout-tagout training because he was on leave. Fossum responded that she understood that Markgren had missed training but that he should have understood the safety risk based on the trainings that he had completed. Dkt. 88-11. She recommended additional training and a written warning. *Id.*

No reasonable jury could conclude from the evidence that Saputo imposed mild discipline on Markgren for the lockout-tagout violation in bad faith or to cover up for discriminatory motives.

## 2. December 28, 2019, physical contact incident

Markgren also contends that the physical violence violation was pretext. A few days after the lockout-tagout incident, Markgren got into a verbal argument with Skow and Selkow in the lower make room. Markgren became upset and got permission to leave for the day. All that is undisputed. The parties now dispute whether Markgren intentionally bumped Skow.

Following the bumping incident, Munson conducted an initial investigation; Fossum and Ellefson investigated further over the next few days. Ellefson met with Miller and Housner on December 31 and reported her conclusion that Markgren had deliberately pushed Skow. Markgren was terminated later that day.

Markgren contests Saputo's conclusion. His core contention is that he did not actually push Skow. Markgren testified that he did not intentionally touch Skow as he left the lower

12

make room, but if the two did touch each other, it was Skow who stepped back into Markgren. Dkt. 45 (Markgren Dep. 113:14–23; 114:1–5).

As the court explained above, the question is not whether Saputo correctly concluded that Markgren had engaged in misconduct. The pertinent question here is whether Saputo honestly believed that Markgren had engaged in misconduct. *Coleman*, 556 F.3d at 852.

Markgren provides several reasons why the physical violence violation was not the true reason for his termination. He first contends that Fossum and Ellefson colluded in conducting a biased investigation to get him fired. He asserts that they did not interview the right witnesses, including one employee who observed what happened and did not see Markgren bump Skow. But Fossum and Ellefson are not required to conduct investigations that meet certain quality standards. And they are not required to interview every witness that they possibly could have. The law is clear that even an impulsive or shoddy investigation does not demonstrate discriminatory intent. *Kariotis v. Navistar Int'l Transp. Corp.*, 131 F.3d 672, 678 (7th Cir. 1997).

Markgren also contends that Fossum and Ellefson knowingly accepted Skow and Selkow's lies during the investigation. Specifically, Markgren argues that Saputo should have known that Skow and Selkow were lying because when Munson initially interviewed them, both discussed the verbal argument but neither mentioned the physical altercation. Dkt. 88-15. Again, this is not evidence of bad faith or a sham investigation. Munson had reported that she witnessed Markgren push Skow immediately after the incident. Dkt. 88-13 and Dkt. 88-14. And Fossum and Ellefson independently interviewed Skow and Selkow after Munson did. During those conversations, both employees reported physical contact. Because Fossum and

13

Ellefson decided to credit a version of events that Markgren disputes does not mean that the investigation was a sham.

Second, Markgren contends that Ellefson deliberately provided Miller with misinformation during the December 31 meeting to get him fired. The parties do not dispute that at the meeting, Ellefson told Miller that Munson, Skow, and Selkow all agreed that Markgren had pushed Skow. She also stated that Markgren had "admitted to the physical contact, but disagreed that it was intentional or severe as the witnesses described, but that it had occurred." Dkt. 47 (Miller Dep. 47:9–12).

Markgren contends that Ellefson mislead Miller when she said that Markgren admitted to the contact. But the evidence does not support an inference that she lied. When Munson asked Markgren why he bumped Skow immediately after the incident, he replied that Skow had "stepped back into him." Dkt. 88-13. When Fossum called Markgren later that day, he stated that Skow "was putting cheese on the rack and stepped backwards. I didn't realize I had touched him until [Munson] said something. I said sorry I must have bumped into him." Dkt. 88-16. Ellefson's statement to Miller is not fundamentally inconsistent with Markgren's responses during the investigation: he acknowledged the physical contact, but neither admitted nor denied that it was intentional. *Id.*

Markgren also contends that Ellefson lied to Miller by omitting important information: she did not tell Miller that Markgren left the plant because he was afraid that he was going to have a heart attack, that the incident occurred in a narrow walkway, that Skow and Selkow had a history of harassing Markgren, that Selkow had started the altercation by turning off Markgren's hose and refusing to help Markgren clean up the cheese spill. If Ellefson had provided this fuller context, it might have informed Miller about the reasons for Markgren's

14

conduct. But Markgren does not explain why this information would have been relevant to the central question in the investigation, which is whether Markgren pushed Skow, not why he did.

The court's task here is not to redo the investigation or to decide if the termination decision was fair. The question for the court is whether Markgren has adduced evidence that Saputo's investigation was so shoddy that a reasonable jury could conclude that Saputo did not honestly believe that Markgren had engaged in misconduct. Markgren has failed to adduce that evidence.

### 3.  Treatment of other employees involved in the physical incident

Markgren also contends that the lockout-tagout and violence policy violations were not the true reasons for his termination because Skow and Selkow kept their jobs, even though they were also culpable in the December 28 incident and had serious disciplinary histories. An employment discrimination plaintiff may establish pretext by adducing evidence that a similarly situated employee without the plaintiff's protected characteristics was treated more favorably. *Coleman*, 667 F.3d at 841. But a similarly situated employee must be directly comparable in all material respects. *Burks v. Wis. Dep't. of Transp.*, 464 F.3d 744, 751 (7th Cir. 2006). Generally, a plaintiff must show that a proposed comparator "dealt with the same supervisor, [was] subject to the same standards and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 690 (7th Cir. 2008).

Skow and Selkow are not adequate comparators to Markgren for two reasons. First, Saputo investigated the December 28 incident and determined that Skow and Selkow were not at fault. So unlike Markgren, neither Skow nor Selkow had physical violence violations in

their personnel records stemming from the December 28 incident. Markgren does not contend that they had violence violations in their disciplinary histories based on any other events, either.

Second, Skow and Selkow's disciplinary histories were not more serious than Markgren's. Saputo's employment records show that between January 2010 and November 2019, Selkow had received 21 warnings: one for sexually inappropriate comments; three for missed timecard punches; ten for tardiness or other attendance issues, two for carelessly using equipment; three for work quality issues, and one for horseplay because he had thrown a piece of cheese. Dkt. 88-34 and Dkt. 88-35. Skow's records list two disciplinary warnings in 2019, for attendance and a lockout-tagout violation. Dkt. 88-40.

Selkow and Skow were not star employees. In fact, Selkow was fired several months after Markgren for making racially offensive comments at work. But Selkow and Skow's employee records at the time of the events in question do not contain violations that compared in seriousness to physical violence against a co-worker. And without comparable disciplinary histories, a comparator is not similarly situated. *Amrhein v. Health Care Serv. Corp.*, 546 F.3d 854, 860 (7th Cir. 2008). Markgren has not established pretext based on similarly situated employees.

### 4. Saputo's treatment of other older employees

Markgren next contends that Saputo had a pattern of terminating of forcing older employees to resign. He points to two older employees, Tammy Toll and Daryl Strohschein, who he says were forced out of their jobs at Saputo after they filed age and disability discrimination claims against the company in 2021. Markgren also cites the forced resignation of Munson in 2020 after she had worked at Saputo for 15 years. And he identified the names

16

of six other "older, long-term employees" who "he did not like how Saputo treated." Dkt. 82, at 31 and Dkt. 103, ¶ 355. But Markgren provides no specific details about these individuals or what happened to them. Without additional information about the employees' situations, the court cannot evaluate whether these are informative comparator employees, or whether they support an inference that Saputo discriminated against Markgren and other older employees because of their age.

### 5. Other evidence of discrimination

Markgren offers several additional reasons why he believes Saputo terminated him on the basis of age, sex, and disability, rather than because of the rule violations. First, he contends that the managers primarily responsible for his termination were able-bodied women who were younger than Markgren. But the mere fact that the decisionmakers involved in Markgren's termination were women is not evidence that they harbored discriminatory animus. Women are not automatically biased against older, disabled men.

Second, Markgren contends that it was suspicious timing to fire him shortly after he returned from a several-months-long disability leave. But the timing is not very suspicious. Markgren was terminated a full eight months after his most recent leave of absence. And he had taken numerous leaves of absence before 2019 without experiencing adverse employment actions. Temporal proximity, absent other evidence of pretext, is rarely enough to evidence to demonstrate discriminatory intent. *Stone v. City of Indianapolis Pub. Utils Div.*, 281 F.3d 640, 644 (7th Cir. 2002).

Third, Markgren contends that Saputo did not follow its own progressive discipline policy when terminating him. A company's failure to follow its own internal procedures can raise an inference of discriminatory motivation in some cases. *See Rudin v. Lincoln Land Cmty.*

*Coll.*, 420 F.3d 712, 723 (7th Cir. 2005) (failing to follow hiring procedures was circumstantial evidence of discrimination in hiring). But Markgren doesn't identify anything that Saputo should have done differently under its policies. He says that he should have received a written warning for the lockout-tagout policy rather than being terminated. But Fossum recommended that warning, even though Markgren did not receive it before he was terminated.. Markgren also says that immediate termination is only warranted under Saputo's internal policies if an employee engages in intentional and gross misconduct. But Markgren was found liable of violating Saputo's physical violence policy for intentionally pushing a coworker, and he does not explain why immediate termination based on the violation was not appropriate under the internal disciplinary rules.

Finally, Markgren contends that he can demonstrate pretext because he was replaced by a 28-year-old woman, Megan Kelsch. But Markgren's evidence on this point is speculation based on hearsay. He testified that he had heard from coworkers that she was operating his machine after he was terminated and ultimately replaced him. Dkt. 45 (Markgren Dep. 126:1–9). For its part, Saputo adduces admissible evidence that it filled Markgren's position with a male employee from a third-party contracting company. Dkt. 58, ¶ 22. But even if Kelsch had replaced Markgren, it would not matter given the lack of other evidence of discrimination in this case. "The mere fact that an older employee is replaced by a younger one does not permit an inference that the replacement was motivated by age discrimination." *La Montagne v. Am. Convenience Prod., Inc.*, 750 F.2d 1405, 1413 (7th Cir. 1984), overruled on other grounds by *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016).

In sum, Saputo has asserted legitimate, non-discriminatory justifications for Markgren's termination. Markgren has not adduced sufficient evidence that these reasons were so

unreasonable or implausible that Saputo did not actually believe and act on them, or any other evidence supporting an inference of pretext. No reasonably jury could find that Saputo fired Markgren because of his age, sex, or disability. The court will grant Saputo's motion for summary judgment on Markgren's wrongful termination claims.

### B. Hostile work environment based on age

Markgren contends that Saputo subjected him to a hostile work environment by allowing his coworkers to harass him because of his age.[11] He says that Skow, Selkow, and another employee, Matt Olson, regularly stole his lockout-tagout tags and personal protective gear and twice filled his locker with hangers in November 2019. Markgren also contends that the February 28 incident constituted harassment by Skow and Selkow.

The ADEA protects workers 40 years of age and older from age-based employment discrimination. The ADEA does not expressly prohibit workplace harassment based on age, but the Seventh Circuit has assumed that plaintiffs may bring hostile work environment claims under the ADEA. *Tyburski v. City of Chicago*, 964 F.3d 590, 600 (7th Cir. 2020). To succeed on his hostile work environment claim, Markgren must show that: (1) he was subject to unwelcome harassment; (2) the harassment was based on his age; (3) the harassment was sufficiently severe or pervasive that it altered the conditions of his employment and created a hostile or abusive atmosphere; and (4) there is a basis for employer liability. *Id*. at 601.

---

[11] In his brief, Markgren contends that Saputo subjected him to a hostile work environment based on his age and disability. But the operative complaint, Dkt. 35, labels Markgren's hostile workplace claim as "harassment based on age in violation of the Age Discrimination in Employment Act" and contains no factual allegations that would support disability-related harassment. Markgren's hostile workplace claim is limited to age under the ADEA.

The parties do not dispute that Markgren was subjected to unwelcome harassment that was sufficiently severe and pervasive. Rather, Saputo contends that Markgren cannot show that his coworkers harassed him because of his age or that Saputo was aware of the discriminatory nature of the harassment.

Markgren's claim fails because he has not pointed to sufficient evidence that he was harassed because of his age. The only evidence that Markgren cites on this point is that Skow, Selkow, and Olson were 20 to 30 years younger than him. But just because Markgren possessed a protected characteristic that his harassers did not does not support an inference of animus. *Hall v. City of Chicago*, 713 F.3d 325, 333 (7th Cir. 2013). And general harassment, personal animosity, and juvenile behavior, absent a link between the harassment and age, is insufficient to establish a hostile workplace claim. *Tyburski*, 964 F.3d at 602 (quotations omitted); *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 660 (7th Cir. 2001). No reasonable jury could find that Markgren faced age-based harassment. The court will grant summary judgment on this claim.

### C. Retaliation

Markgren contends that Saputo terminated him in retaliation for taking medical leave and requesting accommodations for his heart condition in violation of the ADA and FMLA. He also contends that Saputo terminated him to retaliate for complaining about his age-based harassment in violation of the ADEA.

The ADA, ADEA, and FMLA prohibit employers from retaliating against employees who assert their rights under the statutes. *Freelain v. Vill. of Oak Park*, 888 F.3d 895, 900 (7th Cir. 2018). To establish a retaliation claim, Markgren must show that: (1) he engaged in a statutorily protected activity; (2) he suffered an adverse employment action; and (3) there is a

20

causal connection between the two. *Dickerson v. Bd. of Trustees of Comm. Coll. Dist*. No. 522, 657 F.3d 595, 601 (7th Cir. 2011) (ADA); *Malin v. Hospira, Inc.*, 762 F.3d 552, 562 (7th Cir. 2014) (FMLA); *Barton v. Zimmer, Inc.*, 662 F.3d 448, 455 (7th Cir. 2011) (ADEA). The parties also discuss elements of the *McDonnell-Douglas* framework, which would require Markgren to show that he (1) engaged in protected activity; (2) suffered an adverse employment action; (3) was meeting his Saputo's legitimate expectations; and (4) was treated less favorably than similarly situated employees who did not engage in protected activity. *McDaniel v. Progress Rail Locomotive, Inc.*, 940 F.3d 360, 370 (7th Cir. 2019). The ultimate question is whether the record contains sufficient evidence to permit a reasonable jury to find that a retaliatory motive caused the termination. *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016).

Markgren's retaliation claim fails for the same reasons that his wrongful termination claims did. He has failed to present evidence of any comparator who had lockout-tagout and physical violence violations, requested accommodations, and complained about harassment, but was treated more favorably than he was. And he has not adduced any other evidence suggesting that his accommodations requests or complaints about harassment caused his termination. The court will grant summary judgment on Markgren's retaliation claims.

### D. Failure to accommodate

Markgren contends that Saputo failed to give him reasonable accommodation for his heart condition after he was limited to working in temperatures below 100 degrees. The ADA requires an employer to make reasonable accommodations to the known physical or mental limitations of a disabled employee unless the employer can demonstrate that the accommodation would pose an undue hardship on its business. 42 U.S.C. § 12112(b)(5)(A). To prevail on a failure-to-accommodate claim, Markgren must show that: (1) he is a qualified

individual with a disability; (2) Saputo was aware of his disability; and (3) Saputo failed to provide a reasonable accommodation. *Bunn v. Khoury Enterprises, Inc.*, 753 F.3d 676, 682 (7th Cir. 2014).

It is undisputed that Markgren's heart condition was a qualifying disability that Saputo knew about. It also undisputed that Saputo was aware of Markgren's heat restriction, and that temperatures in the Saputo lower make room regularly exceeded 100 degrees.

The central question, therefore, is whether Saputo failed to reasonably accommodate Markgren's heat restriction. Markgren identifies three potential accommodations for his heat restriction that he requested: improved ventilation in the plant, transfer to Saputo's air-conditioned plant, and permission to wear lighter personal protective gear when cleaning. The initial burden is on Markgren to show that each of these accommodations was "reasonable on its face." *Taylor-Novotny v. Health All. Med. Plans, Inc.*, 772 F.3d 478, 493 (7th Cir. 2014) (citing *Oconomowoc Residential Programs v. City of Milwaukee*, 300 F.3d 775, 783 (7th Cir. 2002). An accommodation is reasonable if it is effective and proportional to the costs of implementation. *Oconomowoc*, 300 F.3d at 784. Saputo must then demonstrate that the accommodation is unreasonable, meaning that it would have created an undue financial or administrative hardship for the business. *Taylor-Novotny*, 772 F.3d at 493.

The court concludes that all three of Markgren's requested accommodations were facially reasonable and that Saputo has not demonstrated that they would pose an undue hardship on its business.

First, Markgren testified that he requested better ventilation many times beginning in 2013. Specifically, he says that he suggested Saputo fix the plant's broken air conditioning unit or install a larger exhaust fan in the lower make room. Dkt. 103, ¶ 91. Markgren testified that

22

he did not know how difficult it would be for Saputo to implement these changes. Dkt. 45 (Markgren Dep. 67:6–8). But the court will assume that the improvements would have effectively reduced plant temperatures. And even without additional information on the costs and benefits, the court concludes that steps to improve ventilation in a manufacturing plant that regularly exceeded 100 degrees was facially reasonable. Saputo adduces no evidence that ventilation improvements would have been unduly costly or burdensome.

Second, Markgren requested transfer to Saputo's recently opened and air-conditioned plant in 2017. Saputo told Markgren that he could transfer jobs but that he would have to take a pay cut of two dollars per hour. Markgren testified that he didn't accept the transfer because he couldn't afford the lower wage. Dkt. 45 (Markgren Dep. 127:12–16).

The general rule is that a demotion to a lower-paying job can be a reasonable accommodation if the employer is unable to accommodate the employee in his current job or in an equivalent position. *Ford v. Marion Cnty. Sheriff's Off.*, 942 F.3d 839, 854 (7th Cir. 2019). Neither party specifies what position Markgren was offered at the new plant, so the court will infer that he would have remained a rotary press operator. Absent evidence that equivalent jobs were not open at the new plant, Markgren should have been offered the same wage for the same work at a plant in the same town. Saputo cites Markgren's deposition testimony that the pay cut "kind of makes up for being in the heated room" and that Saputo had a "pay structure already set out, and that's the way they were following it." Dkt. 45 (Markgren Dep. 127:14–15; 128:1–2). But Markgren's personal feelings and perceptions about Saputo's pay policies aren't sufficient to explain the wage differential. Saputo offers none of its own corporate materials justifying lower pay at the new plant, outlining its general pay structure, or

demonstrating why it would have been financially burdensome to keep Markgren's wage the same.

Third, Markgren asked to wear lighter personal protective gear when Saputo began requiring employees to wear more robust personal protective gear in 2017. Previously, employees wore light aprons, gloves, and face shields when cleaning. The new gear for cleaning included pants with a bib, coat, long gloves, hair nest, helmets, and face shields. Markgren testified that the new suit was heavy, unbreathable, and trapped heat, and he requested permission to return to wearing the lighter set of gear. Saputo said no.

Like the other accommodations that Markgren requested, modified personal protective gear to protect him from heat was reasonable on its face. Saputo had used the lighter gear plant-wide for many years, and it does not explain its decision to adopt more robust gear in 2017. Saputo contends that it was not reasonable to exempt Markgren from the company's safety standards. But the only evidence it cites to support this contention is Markgren's deposition statement that personal protective gear is used to protect employees from chemicals and prevent food contamination in a general sense. Saputo does not identify any specific safety concerns with the lighter gear or point to any financial or administrative burdens that the accommodation would have created.

Saputo contends that it offered Markgren an alternative reasonable accommodation to wearing lighter personal protective gear that Markgren declined. Saputo told him that he could take additional breaks if he overheated when wearing the new gear. Saputo is correct that an employee isn't entitled to the accommodation of his choice. *Bunn*, 753 F.3d at 682–83. But a reasonable accommodation must enable the employee to perform his job. *Severson v. Heartland Woodcraft, Inc.*, 872 F.3d 476, 481 (7th Cir. 2017). And Markgren testified that he was unable

24

to take advantage of the additional breaks because he didn't have spare time to complete his work before the end of his shift. Dkt. 45 (Markgren Dep. 130:12–18). He says that he requested more time and extra help, but Saputo did not provide it. *Id.* at 131:6–132:19. Saputo offers no evidence to contradict Markgren's testimony or explain how extra breaks still allowed him to do his job.

Finally, Saputo argues that it had no way to know that Markgren's working conditions were inadequate because he performed his job from 2013 to 2019 without accommodations. But there is sufficient evidence in the record to demonstrate that Saputo was on notice that Markgren needed accommodations. In addition to his requests for better ventilation, a transfer, and lighter gear, Markgren was taken to the emergency room in 2018 and diagnosed with heat exhaustion after working in plant temperatures of 102 to 107 degrees.

A reasonable jury could find that Saputo failed to reasonably accommodate Markgren's heart condition by failing to control his exposure to high temperatures. Saputo's motion for summary judgment on Markgren's failure-to-accommodate claim will be denied.

### E. Discovery motions

Two discovery motions are pending before the court. Saputo moves for a protective order against a large volume of requests for admission, interrogatories, and requests for production of documents that Markgren served on Saputo one month before the close of discovery. Dkt. 108. Markgren moves to compel the deposition of Jim Burdick, a supervisor at Saputo who was involved in the lockout-tagout incident. Dkt. 114.

The court will grant Saputo's motion and deny Markgren's under Federal Rule of Civil Procedure 26(b)(1), which governs the scope of discovery based on relevancy and proportionality to the case, among other factors. The vast majority of the discovery that

Markgren seeks is related to his termination, retaliation, and hostile workplace claims, which will be dismissed. The only discovery that Markgren seeks that is relevant to the remaining failure-to-accommodate claim is a series of requests for admission about his disability accommodations. But the requests merely seek admission to legal conclusions and to facts that have already been addressed at summary judgment. Markgren is not entitled to the additional discovery that he seeks.

ORDER

1. Defendant's motion for summary judgment, Dkt. 54, is GRANTED in part and DENIED in part. The motion is granted with respect to Markgren's wrongful termination, hostile workplace, and retaliation claims, and these claims are DISMISSED with prejudice. The motion is denied with respect to Markgren's failure-to-accommodate claim.

2. Defendant's motion for a protective order, Dkt. 108, is GRANTED.

3. Plaintiff's motion to compel, Dkt. 114, is DENIED.

Entered May 19, 2023.

BY THE COURT:

/s/_____

JAMES D. PETERSON
District Judge

26